In the Matter of GREYSTONE III
JOINT VENTURE, Debtor.

PHOENIX MUTUAL LIFE INSURANCE
COMPANY, Appellant,

v.

GREYSTONE III JOINT VENTURE,
Appellee.

No. 90–8529.

United States Court of Appeals,
Fifth Circuit.

Nov. 19, 1991.

On Petition for Rehearing and
Suggestion for Rehearing En Banc
Feb. 27, 1992.

---

Larry Lesh, John Flowers, Neil L. Sobol, Louis Taylor, Locke, Purnell, Rain & Harrell, Dallas, TX, for appellant.

William B. Finkelstein, Jack F. Williams, Basil H. Mattingly, Hughes and Luce, Dallas, TX, for amicus Teacher Retirement System of Texas, et al.

Christopher F. Graham, Thacher, Proffitt & Wood, New York City, for amicus Amer. CNS of Life Ins., et al.

Adrian M. Overstreet, Stephen W. Sather, Overstreet, Winn & Edwards, Austin, TX, for debtor and appellee.

Before REYNALDO G. GARZA, POLITZ, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal pits a debtor whose only significant asset is an office building in the troubled Austin, Texas real estate market against a lender who possesses a multi-million dollar lien on the property. After obtaining bankruptcy relief under Chapter 11, Greystone III proposed a "cramdown" plan of reorganization, hoping to force a write-down of over $3,000,000 on the secured lender's note and to retain possession and full ownership of the property. Over the secured lender's strenuous objections, the bankruptcy court confirmed the debtor's plan. *In re Greystone III Joint Venture*, 102 B.R. 560 (W.D.Tex.1989). On appeal, the district court upheld the bankruptcy court's judgment. 127 B.R. 138.

For three reasons, we must reverse. First, the Greystone plan impermissibly classified like creditors in different ways and manipulated classifications to obtain a favorable vote. Second, tenant security deposit holders were not properly deemed an "impaired" class under the circumstances of this plan. Third, because we find no "new value exception" to the absolute priority rule codified in 11 U.S.C. § 1129(b)(2)(B), that rule was violated by Greystone's plan.

I.

Appellant Phoenix Mutual Life Insurance Corporation ("Phoenix") lent $8,800,000, evidenced by a non-recourse promissory note secured by a first lien, to Greystone to purchase the venture's office building. When Greystone defaulted on the loan, missing four payments, Phoenix posted the property for foreclosure. Greystone retaliated by filing a Chapter 11 bankruptcy reorganization petition.[1]

At the date of bankruptcy Greystone owed Phoenix approximately $9,325,000, trade creditors approximately $10,000, and taxing authorities approximately $145,000. The bankruptcy court valued Phoenix's secured claim at $5,825,000, the appraised value of

1. No issue concerning the "good faith" of Greystone's Chapter 11 filing has been raised in the papers pertinent to this appeal. *Compare In re* *Humble Place Joint Venture*, 936 F.2d 814 (5th Cir.1991); *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir.1986).

the office building, leaving Phoenix an unsecured deficiency of approximately $3,500,-000—the difference between the aggregate owed Phoenix and its secured claim.

As filed, Greystone's Second Amended Plan of Reorganization (the "Plan"), the confirmation of which is challenged in this appeal, separately classified the Code-created unsecured deficiency claim of Phoenix Mutual, see 11 U.S.C. § 1111(b), and the unsecured claims of the trade creditors. The Plan proposed to pay Phoenix and the trade creditors slightly less than four cents on the dollar for their unsecured claims, but it also provided that Greystone's general partner would satisfy the balance of the trade creditors' claims after confirmation of the Plan.

In a separate class, the Plan further provided for security deposit "claims" held by existing tenants of the office building. These claimants were promised, notwithstanding the debtor's eventual assumption of their leases, 11 U.S.C. § 365, 25% of their deposits upon approval of the Plan and 50% of their deposits at the expiration of their respective leases. The Plan stipulated that the general partner would "retain its legal obligations and ... pay the [tenant] ... creditors the balance of their claims upon confirmation."

Finally, Greystone's Plan contemplated a $500,000 capital infusion by the debtor's partners, for which they would reacquire 100% of the equity interest in the reorganized Greystone.

Unsurprisingly, Phoenix rejected this Plan, while the trade creditors and the class of holders of tenant security deposits voted to accept it. On January 27, 1989, the bankruptcy court held a confirmation hearing at which the Debtor orally modified its Plan to delete the statements that the general partner would pay the balance of trade debt and tenant security deposit claims after confirmation. A Phoenix representative testified that the insurance company was willing to fund its own plan of reorganization by paying off all unsecured creditors in cash in full after confirmation. The bankruptcy court refused to consider this proposal and then confirmed

Greystone's modified Plan. The district court upheld the confirmation.

Phoenix Mutual now appeals on several grounds: (a) the plan classified Phoenix's unsecured deficiency claim separately from that of other unsecured creditors for no valid reason; (b) the "new value exception" to the absolute priority rule did not survive passage of the Bankruptcy Code; and (c) unpaid tenant security deposits were not impaired claims that could vote on the plan.[2]

II.

Phoenix first attacks Greystone's classification of its unsecured deficiency claim in a separate class from that of the other unsecured claims against the debtor. This issue benefits from some background explanation.

Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. 11 U.S.C. § 1122. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly. Second, the classes must separately vote whether to approve a debtor's plan of reorganization. 11 U.S.C. § 1129(a)(8), (10). A plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one-half in number of each "impaired" class, 11 U.S.C. §§ 1126(c), 1129(a)(8); or (2) at least one impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation notwithstanding the plan's rejection by one or more impaired classes. Classification of claims thus affects the integrity of the voting process, for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate "acceptance" by artful classification.

---

2. Because the case is resolved on these issues, we need not discuss appellant's further contention that additional disclosure was required after the debtor orally modified its plan at the confirmation hearing.

In this case, Greystone's plan classified the Phoenix claim in separate secured and unsecured classes, a dual status afforded by 11 U.S.C. § 1111(b) despite the nonrecourse nature of Phoenix's debt. Because of Phoenix's opposition to a reorganization, Greystone knew that its only hope for confirmation lay in the Bankruptcy Code's cramdown provision. 11 U.S.C. § 1129(b). The substantive impact of cramdown will be discussed later. Procedurally, Greystone faced a dilemma in deciding how to obtain the approval of its cramdown plan by *at least one* class of "impaired" claims, as the Code requires.[3] 11 U.S.C. § 1129(a)(10). Greystone anticipated an adverse vote of Phoenix's secured claim. If the Phoenix $3.5 million unsecured deficiency claim shared the same class as Greystone's other unsecured trade claims, it would swamp their $10,000 value in voting against confirmation. The only other arguably impaired class consisted of tenant security deposit claims, which, the bankruptcy court found, were not impaired at all.

Greystone surmounted the hurdle by classifying Phoenix's unsecured deficiency claim separately from the trade claims, although both classes were to be treated alike under the plan and would receive a cash payment equal to 3.42% of each creditor's claim. Greystone then achieved the required favorable vote of the trade claims class.

Phoenix contends that Greystone misapplied § 1122 by classifying its unsecured claim separately from those of trade creditors. The lower courts rejected Phoenix's argument in three steps. First, they held that § 1122 of the Code does not unambiguously prevent classification of like claims in separate classes. The only question is what types of class differentiations among like claims are acceptable. Second, Greystone's unsecured deficiency claim is "legally different" from that of the trade claims because it arises statutorily, pursuant to § 1111(b). Third, "good business reasons" justify the separate classification of these unsecured claims. We must address each of these arguments.

Section 1122 prescribes classification of claims for a reorganization as follows:

(a) Except as provided in subsection (b) or this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such claims.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

We observe from this language that the lower courts' suggestion that § 1122 does not prevent classification of like claims in separate classes is oversimplified. It is true that § 1122(a) in terms only governs permissible *inclusions* of claims in a class rather requiring that all similar claims be grouped together. One cannot conclude categorically that § 1122(a) prohibits the formation of different classes from similar types of claims. But if § 1122(a) is wholly permissive regarding the creation of such classes, there would be no need for § 1122(b) specifically to authorize a class of smaller unsecured claims, a common feature of plans in reorganization cases past and present.[4] The broad interpretation of § 1122(a) adopted by the lower courts would render § 1122(b) superfluous, a result that is anathema to elementary principles of statutory construction.

■ Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections suggests that ordinarily "substantially similar claims," those which share common priority and rights against the debtor's estate, should be placed in the same class. Section 1122(b) expressly creates one

---

**3.** An impaired claim is defined at 11 U.S.C. § 1124. For present purposes, it suffices to say that Phoenix was impaired both as a secured and unsecured creditor.

**4.** Greystone has never sought to justify its separate class of trade creditors under § 1122(b), nor did the lower courts employ that provision in their analysis. There is no suggestion in the Code, however, that a class may be created under § 1122(b) in order to manipulate the outcome of the vote on a plan, rather than simply to enhance administration of the plan.

exception to this rule by permitting small unsecured claims to be classified separately from their larger counterparts if the court so approves for administrative convenience. The lower courts acknowledged the force of this narrow rather than totally permissive construction of § 1122 by going on to justify Greystone's segregation of the Phoenix claim. Put otherwise, the lower courts essentially found that Phoenix's unsecured deficiency claim is not "substantially similar" to those of the trade creditors.

■ Those courts did not, however, adhere to the one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan. As the Sixth Circuit observed:

> [T]here must be some limit on a debtor's power to classify creditors in such a manner.... Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

In re U.S. Truck Co., 800 F.2d 581, 586 (6th Cir.1986). See also In re: Holywell Corp., 913 F.2d 873 (11th Cir.1990); Hanson v. First Bank of South Dakota, 828 F.2d 1310, 1313 (8th Cir.1987); In re Lumber Exch. Ltd. Partnership, 125 B.R. 1000, 1005–1006 (Bankr.Minn.1991); In re Waterways Barge Partnership, 104 B.R. 776, 783–86 (N.D.Miss. 1989) (good discussion); In re Mastercraft Record Plating, Inc., 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983), rev'd on other grounds, 39 B.R. 654 (S.D.N.Y.1984). We agree with this rule, and if Greystone's proffered "reasons" for separately classifying the Phoenix deficiency claim simply mask the intent to gerrymander the voting process,

that classification scheme should not have been approved.

Greystone's reliance on Brite v. Sun Country Development, Inc., 764 F.2d 406 (5th Cir.1985), as an allegedly contrary rule is misplaced. That case allowed the debtor to impair a previously unimpaired class of creditors not for purposes of vote-getting but because the debtor belatedly discovered that it did not have sufficient funds to pay the creditors' claims in full. The court found that the debtor's decision to reclassify previously unimpaired creditors as impaired was necessary. Id. at 408. Sun Country does not support Greystone's argument that plan proponents possess unlimited discretion to classify unsecured claims separately. We conclude that if § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims. To those proffered reasons we now turn.

■ Greystone contends that the "legal difference" between Phoenix's deficiency claim and the trade creditors' claims is sufficient to sustain its classification scheme. The alleged distinction between the legal attributes of the unsecured claims is that under state law Phoenix has no recourse against the debtor personally. However, state law is irrelevant where, as here, the Code has eliminated the legal distinction between non-recourse deficiency claims and other unsecured claims. See 11 U.S.C. § 1111(b)(1)(A); In re Tampa Bay Associates, Ltd., 864 F.2d 47 (5th Cir.1989); Hanson, 828 F.2d at 1313.[5]

■ The purpose of § 1111(b) is to provide an undersecured creditor an election with respect to the treatment of its deficiency claim. Generally, the creditor may elect recourse status and obtain the right to vote in the unsecured class, or it may elect to forego recourse to gain an allowed secured

5. Greystone argues that Hanson is not controlling because the issue there was whether it was clearly erroneous for the bankruptcy court to deny separate classification whereas the issue here is whether it was clearly erroneous for the court to approve the classification. The clearly erroneous rule has no application in this context. Whether a deficiency claim is legally similar to an unsecured trade claim turns not on fact findings but on their legal characteristics. This is an issue of law, freely reviewable on appeal. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1307 (5th Cir.1985). Subsidiary fact findings however, may be entitled to the deference of the clearly erroneous test. Id.

claim for the entire amount of the debt. If separate classification of unsecured deficiency claims arising from non-recourse debt were permitted solely on the ground that the claim is non-recourse under state law, the right to vote in the unsecured class would be meaningless. Plan proponents could effectively disenfranchise the holders of such claims by placing them in a separate class and confirming the plan over their objection by cramdown. With its unsecured voting rights effectively eliminated, the electing creditor's ability to negotiate a satisfactory settlement of either its secured or unsecured claims would be seriously undercut. It seems likely that the creditor would often have to "elect" to take an allowed secured claim under § 1111(b)(2) in the hope that the value of the collateral would increase after the case is closed.[6] Thus, the election under § 1111(b) would be essentially meaningless. We believe Congress did not intend this result.

As the bankruptcy court viewed this issue, the debtor's ability to achieve a cramdown plan should be preferred over the creditor's § 1111(b) election rights because of the Code's policy of facilitating reorganization. The bankruptcy court resorted to policy considerations because it believed Congress did not foresee the potential impact of an electing creditor's deficiency claim on the debtor's aspiration to cramdown a plan. We disagree with this approach for three reasons. First, it results here in violating § 1122, by gerrymandering the plan vote, for the sake of allegedly effectuating a § 1129(b) cramdown. "Policy" considerations do not justify preferring one section of the Code, much less elevating its implicit "policies" over other sections, where the statutory language draws no such distinctions. Second, as shown, it virtually eliminates the § 1111(b) election for secured creditors in this type of case. Third,

the bankruptcy court's concern for the viability of cramdown plans is overstated. If Phoenix's unsecured claim were lower and the trade debt were higher, or if there were other impaired classes that favored the plan, a cramdown plan would be more realistic. That Greystone's cramdown plan may not succeed on the facts before us does not disprove the utility of the cramdown provision. The state law distinction between Code-created unsecured deficiency claims and other unsecured claims does not alone warrant separate classification.

Greystone next argues that separate classification was justified for "good business reasons." The bankruptcy court found that the debtor "need[s] trade to maintain good will for future operations." *In re Greystone III Joint Venture, supra* at 570. The court further reasoned:

> [I]f the expectation of trade creditors is frustrated ... [they] have little recourse but to refrain from doing business with the enterprise. The resulting negative reputation quickly spreads in the trade community, making it difficult to obtain services in the future on any but the most onerous terms.

*Id.* Greystone argues that the "realities of business" more than justify separate classification of the trade debt from Phoenix's deficiency claim. This argument is specious, for it fails to distinguish between the *classification* of claims and the *treatment* of claims. Greystone's justification for separate classification of the trade claims might be valid if the trade creditors were to receive different treatment from Phoenix. Indeed, Greystone initially created a separate class of unsecured creditors that could be wooed to vote for the plan by the promise to pay their remaining claims in full *outside the plan.* Greystone then changed course and eliminated its

---

**6.** In this case, for example, Greystone proposed to extinguish Phoenix's $3,500,000 deficiency claim by the promised payment of $140,000. Under the valuation process, it confined Phoenix's secured claim to $5.8 million. 11 U.S.C. § 506(a). Phoenix obviously objects to this arrangement because, in the future, it might ultimately receive more than the written-down value of the office building in a liquidation following foreclosure. Yet, with its voting rights effectively

eliminated by separate classification, Phoenix has no leverage to persuade the Debtor to consider a more reasonable settlement. Had this scenario triumphed, Phoenix's most realistic option might have been to take an allowed secured claim in the hope that eventually the market value of the office building will increase by more than $140,000 over the presently estimated value of the collateral.

promise. Because there is no separate treatment of the trade creditors in this case, we reject Greystone's "realities of business" argument.

Even if Greystone's Plan had treated the trade creditors differently from Phoenix, the classification scheme here is still improper. At the confirmation hearing, none of the Debtor's witnesses offered any reason for classifying the trade debt separately from Phoenix's unsecured deficiency claim. There is no evidence in the record of a limited market in Austin for trade goods and services. Nor is there any evidence that Greystone would be unable to obtain any of the trade services if the trade creditors did not receive preferential treatment under the Plan. Thus, the bankruptcy court's finding that there were good business reasons for separate classification is without support in the record and must be set aside as clearly erroneous.[7]

Phoenix's unsecured deficiency claim approximates $3,500,000, while the claims of the unsecured trade creditors who voted to accept the Plan total less than $10,000. Greystone's classification scheme, which effectively disenfranchised Phoenix's Code-created deficiency claim, is sanctioned neither by the Code nor by caselaw. The lower courts erred in approving it.

## III.

As a fall-back position, Greystone argues that the office-building tenants constitute an impaired class whose votes for Greystone's Plan should have been considered for purposes of satisfying the pre-condition of cramdown that there be one assenting, impaired class. The bankruptcy court held that the tenants were not an impaired class and could not vote on the Plan because Greystone had assumed their leases. The district court disagreed and held that despite the Debtor's assumption of the leases, the tenants could be counted as an impaired accepting class. Phoenix argues this was error.

A debtor in Chapter 11 must either assume or reject its leases with third parties. 11 U.S.C. § 365. If the debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. *See Matter of Whitcomb & Keller Mortgage Co.,* 715 F.2d 375, 378–79 (7th Cir.1983); *In re Cochise College Park, Inc.,* 703 F.2d 1339, 1352 (9th Cir.1983). Under the Code, only creditors are entitled to vote on a plan of reorganization. *See* 11 U.S.C. § 1126(c). A party to a lease is considered a "creditor" who is allowed to vote, 11 U.S.C. § 1126(c), only when the party has a claim against the estate that arises from *rejection* of a lease. *In re Perdido Motel Group, Inc.,* 101 B.R. 289, 293–94 (Bankr. N.D.Ala.1989). If, however, the debtor expressly assumes a lease, the lessee has no "claim" against the debtor under § 1126(a). *See* 11 U.S.C. §§ 365(g), 502(g). The rights created by assumption of the lease constitute a post-petition administrative claim under section 503(b)(1)(A) of the Code. *LJC Corp. v. Boyle,* 768 F.2d 1489, 1494 n. 6 (D.C.Cir. 1985). The holder of such a claim is not entitled to vote on a plan of reorganization. 11 U.S.C. § 1126(a); *In re Distrigas Corp.,* 66 B.R. 382, 385–86 (Bankr.D.Mass.1986).

Here, Greystone never rejected its leases with the tenants. There is thus no support for the assertion that the tenants' "claims" entitled them to vote on Greystone's Plan. The district court erred in alternatively permitting confirmation of the Plan based on the tenants' affirmative votes.

Although we must remand simply because the Greystone Plan mis-classified creditors' claims, it remains possible that Greystone will propose another plan incorporating, as did this one, the "exception" to the absolute priority rule. For the sake of judicial economy, we consider that possibility next.

## IV.

Greystone's Plan relied upon the "new value exception" to the "absolute priority rule"

---

**7.** Two standards of appellate review apply to the debtor's classification of claims. Issues such as the similarity in priority and legal attributes and the ultimate question whether treatment in the same or separate classes is necessary, are legal issues reviewable by our court *de novo.* *See* n. 5 *supra.* Whether there were any good business reasons to support the debtor's separate classification of claims is a question of fact.

to justify retaining ownership of the office building notwithstanding the plan's write-down of over 33%, or $3.5 million, of its debt to Phoenix. Outside of bankruptcy, such a result would be unthinkable, for Phoenix could have foreclosed and taken back its building for better or worse. Whether current bankruptcy law permits this egregious alteration of rights without the secured creditor's consent has generated considerable controversy.[8] The lower courts held in favor of Greystone. We do not.

On its face, the Code does not appear to allow the equity owners of a bankrupt enterprise, or any junior creditors for that matter, to retain or obtain ownership and control of the debtor without the appropriate consent of senior creditors. This "absolute priority rule" is codified at 11 U.S.C. § 1129(b)(2)(B) as a definition of the "fair and equitable" standard for plan confirmation. Thus, the holder of any claim or interest that is junior to the claims of an unsecured class may not receive *any property* on account of its claim or interest until the senior claims are repaid in full. *Id.* It is undisputed that the right to run the reorganized business is property. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). The purpose of this section is to stratify creditors and equity interests so that a cramdown, or nonconsensual, plan will not redistribute a dissenting creditor's property rights to those with a junior right or interest in the debtor. Such a result would be neither fair nor equitable. *In re Greystone III*, 102 B.R. at 574.

It was Greystone's burden to demonstrate how its owners' offer to infuse $500,000 into the debtor, paying off only a tiny fraction of Phoenix's deficiency claim, satisfied the absolute priority rule. Greystone's argument proceeds in four phases. First, before adoption of the Bankruptcy Code the term "fair

and equitable" had an established meaning that, under certain circumstances, allowed a deviation from the absolute priority rule if equity owners agreed to put cash into the company in exchange for an appropriate ownership interest. *See, e.g., Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10–11, 84 L.Ed. 110 (1939) (dictum). Second, because the Code did not specifically overrule the prior judicial understanding of the fair and equitable standard, it must have incorporated that standard by including the "new value exception" in § 1129(b)(2)(B). Third, if § 1129(b)(2)(B) does not specifically codify the "new value exception," it represents only a partial definition of "fair and equitable" that leaves room for one. Fourth, Greystone's offer of $500,-000 satisfies the new value exception.

With due respect to the ingenuity of Greystone's statutory construction agreement, we feel compelled nevertheless to paraphrase Gertrude Stein: "There is no *there* there." It is not obvious, for instance, that the *Case* "new value exception" is meaningful in the context of Chapter 11's reorganization provisions, which differ markedly from the prior law. When *Case* was decided, the unanimous consent of all creditor classes was required in addition to a fair and equitable plan conforming to the absolute priority rule. *Case*, 308 U.S. at 114 n. 6, 60 S.Ct. at 6, n. 6. The 1978 Bankruptcy Code, however, permits less-than-unanimous acceptance of a creditor class to suffice even if the absolute priority rule is not satisfied and alternatively specifies conditions for cramdown plans. 11 U.S.C. §§ 1129(a), 1129(b)(2). This increased flexibility arguably renders the *Case* exception unnecessary and is certainly a significant distinction from the statutory background to that decision. *In re Outlook/Century, Ltd., supra.*

---

**8.** In *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988), the Supreme Court expressly declined to rule on whether a "new value exception" to the absolute priority rule survived enactment of the Bankruptcy Code. The circuit courts are divided. *See, e.g., Kham & Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351 (7th Cir.1990) (dicta) (questioning continued vitality of absolute priority rule); *In re Anderson*, 913 F.2d 530, 532–33 (8th

Cir.1990) (exception exists); *In re U.S. Truck Co.*, 800 F.2d 581, 587–88 (6th Cir.1986). Bankruptcy courts have been sharply divided on the issue. *Compare In re Outlook/Century, Ltd.*, 127 B.R. 650, 656 (Bankr.N.D.Cal.1991) and *In re Lumber Exchange Ltd. Partnership*, 125 B.R. 1000 (Bankr.Minn.1991) (no new value exception), *with In re Sawmill Hydraulics, Inc.*, 72 B.R. 454, 456 n. 1 (Bankr.C.D.Ill.1987).

Greystone's efforts to parse the statutory language for evidence of incorporation of the "new value exception" are similarly unpersuasive. Greystone relies on two phrases in § 1129(b)(2). It is contended that by defining the "fair and equitable standard" to "include the following requirements," the definition is demonstrably incomplete, leaving implicit room for a new value exception. This seems unlikely, because the quoted phrase sets a *minimum standard* for a fair and equitable plan that may be confirmed over creditor objections. *Matter D & F Construction, Inc.,* 865 F.2d 673, 675 (5th Cir.1989). The "new value exception," by contrast, dilutes the minimum requirement.

Alternatively, Greystone focuses on the condition in § 1129(b)(2)(B)(ii) that a junior claim or interest may not receive or retain property *on account of* its interest until more senior parties are fully satisfied. This argument holds that if "old equity" infuses new money into the debtor, it is not retaining its ownership "on account of" its old equity status. This is mere wordplay, because Greystone intends to prevent creditors from acceding to ownership of the property *on account of* Greystone's unique status as an old equity contributor to the plan. More specifically, Greystone desired to prevent a competitive auction of the property, at which Phoenix could credit bid, precisely because of Greystone's old equity status. Greystone cannot read the statutory language in such a self-serving way.

Greystone next contends that if the statute does not express or imply a new value exception, it merely intended to codify pre-existing law and is not inconsistent with such law. This position attributes too little weight to the statutory language, which "we are to take ... seriously even when it alters pre-Code practices." *Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351 (7th Cir.1990) (Easterbrook, J.), citing *Pennsylvania Dept. of Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990). Moreover, as Judge Easterbrook and others have observed, Congress clearly rejected a proposal by the Bankruptcy Commission to modify the absolute priority rule when it enacted the Code. *See, e.g.,* Brudney, *The Bankruptcy Commission's Proposed "Modifications" of the Absolute Priority Rule,* 48 Am.Bankr.L.J. 305 (1974). *In re Outlook/Century, Ltd., supra.* From this history one can infer that Congress acted knowledgeably in codifying a strict absolute priority rule. Such history also contradicts the suggestion that the "new value exception" is merely a "logical expansion" of the codified absolute priority rule, *In re Greystone III,* 102 B.R. at 574, because it was part of the pre-Code "fair and equitable" standard. Further, to the extent that these arguments advocate equitable variations from the absolute priority rule, they conflict with *Ahlers'* observation that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Ahlers, supra,* 485 U.S. at 206, 108 S.Ct. at 968–69.

In an amicus brief, a final reason suggested for applying the "new value exception" within the codified absolute priority rule is that the Code does not prohibit a cramdown reorganization plan that sells the debtor to its former equity owners, and the "new value exception" is necessary to rein in that potential force for self-dealing. We disagree with the assumption that the Code permits a *nonconsensual* plan to "sell" the debtor to its old equity owners. This flies in the face of the creditor control principle embodied in Chapter 11 and accepted by *Ahlers:*

> The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents' reorganization plan was confirmed. But that determination is for the creditors to make in the manner specified by the Code. 11 U.S.C. § 1126(c).

485 U.S. at 206, 108 S.Ct. at 969.

Moreover, permitting the courts, pursuant to a "new value exception," rather than the creditors, under a strict absolute priority rule, to determine the conditions of former equity owners' participation in a reorganized debtor introduces an enormously complicating factor in a carefully balanced bargaining structure. The proposed test for the "new value exception" is exceedingly vague—requiring the infusion in (a) money or money's worth of (b) substantial (c) new value, (d)

reasonably equivalent to the extent of old equity's proposed participation in the reorganized debtor, and (e) necessary to such reorganization. Amicus Brief of Prof. Warren, at 12. If these criteria are essentially factual, then each bankruptcy court can impose its freewheeling view of reorganization policy without fear of appellate reversal. Creditors and the debtor are left to guess, *not what each other's* "bottom line" *position is* for a consensual plan, *but rather what the particular court sees* as a "bottom line" cash contribution that will permit cramdown of an old equity plan under the "new value exception." It is dubious to suppose that courts will ordinarily possess superior foresight than the creditors themselves concerning the creditors' best interests. Here, for instance, Greystone owed Phoenix $3.5 million above the value of its collateral, yet the court allowed it to pay $140,000 on that obligation and retain complete ownership for a half-million dollar capital infusion. Meanwhile, Greystone remains obligated for only about $5.8 million on what was originally an $8.8 million loan. If the bankruptcy courts may implement "new value," nonconsensual reorganization plans governed by such amorphous standards, one wonders why Congress bothered to frame elaborate ground rules for achieving consensual plans. Negotiations between creditors and the debtor against such a "new value exception" backdrop would be enormously skewed in favor of old equity and would seriously erode the utility of the creditors' votes.

Neither in the Code's language, nor in the context of a previous, different reorganization law, nor in legislative history, nor in policy is there room for a "new value exception" to the absolute priority rule now defined by § 1129(b)(2)(B).

Because of this conclusion, it is unnecessary to determine whether the lower courts properly applied a "new value exception" to the absolute priority rule. We note, however, that even though the "standards" for that exception are most difficult to consider effectively on appeal, the bankruptcy court erred in refusing to consider Phoenix's proposed equity contribution plan along with that of former equity. There is no statutory or poli-

cy reason why the court should have arbitrarily rejected a competing bid by Phoenix to infuse equity into the debtor after the exclusivity period lapsed. *See* 11 U.S.C. § 1121.

### V.

For the foregoing reasons, the judgment of the district court affirming the bankruptcy court's confirmation of Greystone's plan of reorganization is REVERSED. The case is REMANDED for proceedings consistent with this opinion.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC.

Before POLITZ, Chief Judge, REYNALDO G. GARZA and JONES, Circuit Judges.

PER CURIAM:

A majority of the panel having voted to grant rehearing in part, the opinion of the court in disposing of this appeal is as follows:

Part IV of the panel opinion, found at 995 F.2d 1274, 1281–84 (5th Cir.1991), is hereby withdrawn and deleted from the opinion. In connection with that determination, the last paragraph of Part III also is deleted. Further, in the first sentence of the second paragraph of the opinion, the word "three" is changed to "two," and the last sentence of that paragraph is deleted. Part V of the opinion is renumbered to IV. In withdrawing this portion of the panel opinion we emphasize that the bankruptcy court's opinion on the "new value exception" to the absolute priority rule has been vacated and we express no view whatever on that part of the bankruptcy court's decision.

Other than these revisions, the original opinion is reinstated and the petition for panel rehearing is DENIED. Further, no member of the panel or judge in active service having requested that the court be polled on rehearing en banc, *see* Fed. R.App.P. and Local Rule 35, the suggestion for rehearing en banc is DENIED.

EDITH H. JONES, Judge, dissenting:

How one should approach issues of a statutory construction arising from the Bankruptcy Code has been clouded, in my view, by *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1991). Nevertheless, in reaffirming what I wrote about the "new value exception" in Part IV of the original opinion, and therefore in voting against a rehearing, I would hope to stand with Galileo, who, rebuffed by a higher temporal authority, muttered under his breath, "Eppur si muove." ("And yet it moves.")