**In re TUCSON PROPERTIES CORPORATION, an Arizona corporation, Debtor.**

**Bankruptcy No. 94–01564 TUC JMM.**

United States Bankruptcy Court, D. Arizona.

Sept. 20, 1995.

Gary G. Keltner, Jennings, Strouss & Salmon, P.L.C., Phoenix, AZ, for Metropolitan Life Ins.

Eric Slocum Sparks, Sparks & Cather, P.C., Phoenix, AZ, for debtor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and MEMORANDUM DECISION

JAMES M. MARLAR, Bankruptcy Judge.

A *Motion to Dismiss* was filed by Metropolitan Life Insurance Company ("Met-Life"). Hearings were held on January 11 and 24, 1995. Briefs were filed, evidence

taken, and arguments made. MetLife was represented by Gary G. Keltner; the debtor was represented by Eric Slocum Sparks. After consideration of the evidence, argument, pleadings and this Court's files in both the pending and prior cases, the Court enters the following findings of fact, conclusions of law and memorandum decision.

### The Debtor, Its Property and Its Creditors

1. The debtor is an Arizona corporation, formed on October 21, 1992.

2. An entity known as the Spector Revocable Trust is the 100% shareholder. (First case, Dkt. 27, "List of Equity Security Holders").

3. The debtor own and operates commercial real property at the following locations in Tucson, Arizona:

 A) *5390 E. Erickson, Tucson, Arizona.* Co-owners with Tucson Medical Center. Leased to Tucson Medical Center pursuant to long-term lease.

 B) *6121–6133 E. Broadway, Tucson, Arizona.* Retail shopping center.

4. The value of the Erickson property was listed at $400,000, while the value of the Broadway property was indicated to be $1,500,000.

5. At the date of filing, the debtor had cash on hand of $17,278, and $3,972 in the hands of Arnco & Associates, the manager of the Broadway property.

6. Liens against the properties were listed, in the schedules, as follows:

Metmor Financial Inc. (affiliate of MetLife)—Lien on Broadway property, for $1,371,284.00;

Spector Investment Corp.—Lien on Erickson property, for $700,000.00.

7. In the second case, unsecured debt to an insider, Larry D. Spector, was listed for $105,000.00. Additional trade and attorney debt was listed as an additional $138,069.

8. Mr. Spector was also listed as President and sole stockholder of the debtor, and he signed the Schedules and Statement of Affairs. (The role of stockholder differed from the earlier designation of Spector Revocable Trust as the debtor's only shareholder). Compare "List of Equity Security Holders" with Statement of Affairs No. 5.

9. The debtor corporation is closely held by the Spector Family.

### The Debtor's First Case

1. The debtor filed case No. 93–01177 on April 29, 1993. The debtor was represented by Gregory D'Antonio.

2. During the early stages of the case, the debtor petitioned the Court for the appointment of its attorney, accountants, its property manager on the Broadway property (Arnco and Associates of Arizona, Inc.), and sought payment of salaries to Lawrence Spector, Cathy Spector, Ronald Spector and Shirley Johnson. An order approving the salary request was entered June 14, 1993.

3. During the case, the debtor filed the following monthly reports:

| MONTH | DKT. | INCOME | EXPENSES | SURPLUS (DEFICIT) | PERCENT LEASED | COMMENT |
|---|---|---|---|---|---|---|
| May, 1993 | 9 | $24,407 | $20,146 | $ 4,261 | 65% | |
| June, 1993 | 29 | 29,535 | 11,484 | 18,051 | 65% | |
| July, 1993 | 38 | 26,572 | 25,778 | 794 | 62% | $12,500 to Spector Inv. |
| Aug., 1993 | 56 | 26,093 | 55,338 | (29,245) | 66% | $40,000 to MetLife |
| Sept., 1993 | 64 | 31,314 | 26,853 | 4,461 | 66% | $12,000 to secured creditor Spector |
| Oct., 1993 | 79 | 18,981 | 38,077 | (19,096) | | $12,085 paid to Spector Investments |
| Nov., 1993 | 87 | 24,747 | 28,266 | ( 3,519) | | $8,000 to undisclosed secured creditor |

| MONTH | DKT. | INCOME | EXPENSES | SURPLUS (DEFICIT) | PERCENT LEASED | COMMENT |
|---|---|---|---|---|---|---|
| Dec., 1993 | 100 | 49,529 | 11,610 | 37,919 | | $24,500 returned from Spector Inv. |
| Jan., 1994 | 109 | 30,208 | 10,764 | 19,444 | 69% | |
| Feb., 1994 | 118 | 29,649 | 10,478 | 19,171 | 71% | |
| March, 1994 | 122 | 28,186 | 11,651 | 16,535 | 77% | |
| April, 1994 | 123 | 32,304 | 48,438 | (16,134) | 77% | |

4. On June 17, 1993, MetLife, the secured creditor, became active in the case. It filed a *Motion to Prohibit Use of Cash Collateral.* (Dkt. 15). The debtor opposed the motion (Dkt. 22). At a hearing on August 3, 1993, the debtor was ordered to present a budget in 15 days.

5. MetLife also filed:

a. September 27, 1993—a *Proof of Claim* for $1,394,461. MetLife claimed that a default had existed since April 1, 1993;

b. June 17, 1993—a *Motion for Stay Relief* alleging a perfected and priority lien on the Broadway property for a loan of $2,275,000 made March 8, 1980. The debtor's monthly payments were alleged to be $20,191. The debtor opposed the motion. In such motion, MetLife claimed that, other than MetLife, the two only other creditors were insiders.

Thus, the debtor would be unable to gain the required acceptance of an impaired consenting class. In addition, MetLife noted that the debtor was only formed about six months earlier. (Dkt. 47, M–93–601). The debtor filed the affidavit of Larry D. Spector, raising, as legal issues, both the existence of equity and the prompt filing of a reorganization plan. (Dkt. 50, M–93–601). Stay relief was denied on Sept. 2, 1993. (Dkt. 58, M–93–601). The debtor was also ordered to submit a detailed budget by September 8, 1993.

6. A Budget was filed September 13, 1995.

7. The debtor filed its Plan and Disclosure Statement on August 18, 1993 (Dkt. 42, 43). The Plan proposed the following treatment of its claims:

| CLASS | CREDITOR | TREATMENT | IMPAIRMENT |
|---|---|---|---|
| 1 | Administrative | U.S. Trustee and others paid at confirmation | N/A. Not a voting class |
| 2 | Tax Claims | Paid in full at confirmation | No |
| 3A | MetLife | Retain lien. 7% interest only payments until April 1, 1995, when all paid in full. | Yes |
| 3B | Spector Investment | Retain lien. Bifurcate into secured and unsecured portions. 7% interest. Principal and interest payments of $3,465 until paid. | Yes |
| 4 | Unsecured creditors | Paid 100% over time, on a sliding scale. | Yes |
| 5 | Owners | Retain interests | N/A |

8. On November 12, 1993, the debtor filed its Amended Plan and Disclosure Statement (Dkt. 71). Its treatment of creditors was:

| CLASS | CREDITOR | TREATMENT | IMPAIRMENT |
|---|---|---|---|
| 1 | Administrative | Same | N/A. Not a voting class |
| 2 | Tax Claims | Same | No |
| 3A | MetLife | Retain lien. Now undersecured. 7% interest only at $6,706 per month. Paid by April 1, 1995. | Yes |

| CLASS | CREDITOR | TREATMENT | IMPAIRMENT |
|-------|----------|-----------|------------|
| 3B | Spector Investment | Retain lien. Payment on secured portion, principal and interest, at $6,706 per month until paid | Yes |
| 4A | Unsecured Trade | Paid in full at confirmation | N/A. No claims in this class |
| 4B | Undersecured Creditors (MetLife) | Paid 5.5% of total claims over time. | Yes |
| 4C | Insiders | Paid 5.5% of total claims over time. | Yes |
| 4D | Rejection of Executory Contracts | Paid in full at confirmation | N/A. No claims in this class |
| 5 | Owners | Same | N/A |

9. MetLife objected to the Disclosure Statement on September 21, 1993. (Dkt. 50). After two continuances, the matter was set for December 7, 1993. (Dkt. 70).

10. On October 4, 1993, the court ordered the debtor to file a meaningful and detailed budget, by October 25, 1993. On October 28, 1993, the debtor filed its detailed accounting. (Dkt. 68).

11. On November 4, 1993, MetLife filed a *Motion to Convert or Dismiss,* alleging unauthorized payments to the Spector entities, in violation of MetLife's rights in and to rents and cash collateral, delays in providing budgets and responding to cash collateral demands, delay in proposing a plan, proposal of an unconfirmable plan, and diminishment of the estate. (Dkt. 69).

12. The debtor opposed the *Motion to Dismiss* (Dkt. 74), primarily on the ground that it had filed a new plan.

13. Correction pages to the plan were filed on November 17, 1993. Changes were 1) that the Spector secured claim would become interest-only at 7%, and payable at refinancing or sale, and 2) the MetLife and Spector unsecured portions would be paid 42.24% of their claims. (Dkt. 75, 76).

14. On December 3, 1993, the court entered its order again limiting use of the cash collateral to normal operations, and directing the return of unauthorized payments previously paid to the Spector Investment Corporation Benefit Pension Plan. On December 31, 1993, the sum of $24,499.98 was returned to the estate. (Dkt. 97).

15. On December 7, 1993, the court heard argument, and ruled upon MetLife's Motion to Dismiss. It granted the motion, and ordered MetLife to lodge proposed findings of fact and conclusions of law. (Dkt. 84).

16. That minute entry was appealed on December 17, 1993. (Dkt. 85).

17. The court entered Findings of Fact and Conclusions of Law on February 23, 1994. (Dkt. 108). Its Order Dismissing the case was filed February 27, 1994. (Dkt. 107).

18. Additional pleadings were filed to perfect the appeal.

19. MetLife set a Trustee's Sale of the Broadway Property for June 14, 1994. (Dkt. 127).

20. On May 16, 1994, the debtor sought leave, from the Bankruptcy Appellate Panel, to dismiss its appeal.

21. A stay pending appeal was sought by the debtor, and denied on June 10, 1994. (Dkt. 128).

22. On June 9, 1994, the Bankruptcy Appellate Panel dismissed all of the debtor's appeals. (Dkt. 129).

23. On June 13, 1994, the debtor filed a new Chapter 11 case.

### The Debtor's Second Case (94–01564 TUC JMM)

1. The debtor's second case was filed on June 13, 1994. (Dkt. 1).

2. The Statement of Affairs listed Larry D. Spector as the "sole shareholder." (Statement of Affairs, Question 19).

3. The debtor listed 15 unsecured claims, exclusive of insider loans made by Mr. L.D. Spector ($105,000) and attorneys fees to the debtor's prior attorneys ($22,224). Other "trade" debts totalled $115,845.

4. Priority tax claims were now listed at $36,980.

5. Secured claims remained essentially the same, with the exception that two new creditors, Kieft and Ulan, were added, each for $25,000, holding liens on the Erickson property.

6. The debtor also changed attorneys, and was represented in this case by Eric S. Sparks.

7. MetLife Life moved for adequate protection on June 27, 1994 (Dkt. 7), and did not consent to the use of cash collateral. (Dkt. 8).

8. In a Proof of Claim filed December 5, 1994, MetLife claimed an amount due, as of June 13, 1994, in the sum of $1,645,447.84.

9. On October 11, 1994, the debtor filed a Disclosure Statement and Plan of Reorganization (Dkt. 49, 50). In its essence, the plan provided the following treatment to its creditors:

| CLASS | CREDITOR | APPROXIMATE CLAIM AMOUNT | TREATMENT | IMPAIRMENT | COMMENT |
|---|---|---|---|---|---|
| 1 | Administrative | $80,000 | Presumably payment on effective date | N/A | Not a voting class |
| 2 | Employees | –0– | Payment on effective date | No | No claims in this class |
| 3 | Tax Claims | $3,100 | Paid within 90 days | Yes | —— |
| 4 | Real Property Taxes | $34,224 | Retain lien. 5–year payout, with interest. Annual payments. | Yes | —— |
| 5 | MetLife Secured | $1,225,000 (est.) | Value claim. Any undersecured portion shall be an unsecured claim. Secured portion to be paid at 9.5%; 30–yr. amortization; monthly payments; 10–yr. balloon; Freely transfer; non-recourse. | Yes | Debtor believed property was worth $1,000,000. (Later appraisal in file values the property at $1,225,000) |
| 6 | MetLife Unsecured | $420,447 (est.) | Treated as class 12? Unsecured. Probably intends this to be class 10. | Yes | Court believes this is a duplicate. Real intent is class 10 |
| 7 | Spector Investment | $822,000 | Fully Secured. 9%; 30–year amortization. Monthly payments; 10–yr. balloon. | Yes | —— |
| 8 | Kieft | $25,000 | Same as Class 7 | Yes | —— |
| 9 | Ulan | $25,000 | Same as Class 7 | Yes | —— |
| 10 | MetLife Deficiency | $420,447 (est.) | Paid 30% of net cash flow for 60 months. | Yes | —— |
| 11 | Trade | $145,000 | Full? No description of payment | Yes | —— |

8. The debtor's income and expenses were:

| MONTH | DKT. | INCOME | OPERATING EXPENSES | SURPLUS (DEFICIT) | PERCENTAGE LEASED |
|---|---|---|---|---|---|
| June 1994 | 17 | $26,957 | $7,307 | $19,650 | —— |
| July 1994 | 30 | $30,550 | $12,187 | $18,363 | 74% |
| Aug. 1994 | 42 | $30,945 | $10,677 | $20,268 | 74% |
| Sept. 1994 | 54 | $32,624 | $9,587 | $23,037 | 69% |
| Oct. 1994 | 66 | $25,428 | $38,305 | (12,877) | 69% |
| Nov. 1994 | 78 | $28,734 | $9,873 | $18,861 | 69% |
| Dec. 1994 | 104 | $36,843 | $12,132 | $24,711 | 76% |
| Jan. 1995 | 118 | $36,387 | $12,038 | $24,349 | 76% |
| Feb. 1995 | 126 | $29,867 | $7,459 | $22,408 | 76% |

| MONTH | DKT. | INCOME | OPERATING EXPENSES | SURPLUS (DEFICIT) | PERCENTAGE LEASED |
|---|---|---|---|---|---|
| Mar. 1995 | 131 | $44,128 | $25,139 | $18,989 | 85% |
| Apr. 1995 | 141 | $30,832 | $40,172 | (9,340) | 85% |
| May 1995 | 142 | $37,573 | $13,934 | $23,639 | 85% |
| June 1995 | 149 | $46,826 | $12,476 | $34,350 | 85% |
| July 1995 | 150 | $34,829 | $8,872 | $25,957 | 84% |

9. On October 12, 1994, the debtor hired special counsel to assist it in legal matters related to the operation of the shopping center. (Dkt. 47).

10. The Disclosure Statement hearing was set for December 5, 1994. (Dkt. 52). An objection, by MetLife, was filed November 28, 1995 (Dkt. 67, 69). Pima County also filed an objection, claiming real property taxes (Dkt. 68). At the December 5, 1994 hearing, the Court deferred ruling until after the MetLife Motion to Dismiss was ruled upon. (Dkt. 72).

11. On December 5, 1994, MetLife filed a *Motion to Dismiss* (Dkt. 70). The matter was heard, as an evidentiary hearing, on January 11, 1995. Post-hearing briefs were submitted January 20 and January 23 (Dkts. 106, 107). Final arguments were made on January 24, 1995. (Dkt. 110).

12. On December 22, 1994, MetLife filed a *Motion for Stay Relief.* The debtor responded (Dkt. 92). On January 18, 1995, the parties agreed to consolidate the matter with a hearing on confirmation (Dkt. 109).

13. On January 23, 1995, Larry and Cathy Spector returned $14,000 to the DIP account.

14. On February 3, 1995, the debtor filed an appraisal. The appraiser was Neil O. Kleinman, MAI, and the valuation placed upon the Broadway Property was $1,225,000.

15. To date, all controversies have been held in check, awaiting the outcome of the *Motion to Dismiss.*

16. However, on June 12, 1995, MetLife again brought a *Motion to Compel Compliance* with the cash collateral orders. (Dkt. 144). This matter was heard on June 26, 1995. (Dkt. 144).

### Court Preparation For This Decision

Because of the volume of the files in the two cases, it has taken the Court a lengthy period of time to review the files. In addition, the Court has considered its own notes and the transcript of the January 11, 1995 hearing. Delay has also been occasioned by the Court's calendar, both in and outside of the District of Arizona. The Court apologizes to the parties for the unusual delay. Nonetheless, in view of the significance of the matters involved herein, only a careful review of the pleadings and the record would do the parties substantial justice.

### DISCUSSION

The *Motion to Dismiss* is based upon numerous grounds, which can be summarized and consolidated into the following general categories: (1) the case was filed in bad faith due to dismissal of a prior case; (2) the debtor's plan is unconfirmable; and (3) the debtor has failed to comply, in spirit and in fact, with court orders. Each area will be discussed in turn.

#### 1. Good Faith

The starting point for the good faith inquiry, in this case, begins with the filing of the first case on April 29, 1993. That case was dismissed by Judge Ollason on February 27, 1994, with supporting Findings of Fact and Conclusions of Law filed on February 23, 1994. An appeal was taken by the debtor, but then dismissed, upon the debtor's motion, on June 9, 1994. Within four days, the debtor filed a new, second Chapter 11 case, on June 13, 1994. The debtor's motivation for so doing appeared to be to gain settlement leverage, instead of pursuing what the debtor must have considered to be a losing appeal. Most serial filings do not contain objective evidence of motive, but this one does. On April 29, 1994,

the debtor's attorney, Herman Zickerman, in an effort to gain favorable settlement terms, wrote to attorney Gary G. Keltner:

> "Further, if my client elects, it could dismiss the pending bankruptcy appeal and seek to file a new bankruptcy, which would further delay your client's return of the property and could ultimately result in a cram-down Plan...."

See Ex. 3. When the settlement failed to materialize, the threat was carried out, and this case was filed. Even though the debtor has changed counsel, who pleads ignorance of the prior counsel's strategies, it is not counsel who is alleged to have acted in bad faith—it is the debtor. The actions of attorneys, on behalf of their clients, are imputed to the clients. *Pioneer Inv. Services Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). Clients must be held accountable for the acts and omissions of their attorneys, otherwise our system of representative justice would be thwarted. *Id.,* 507 U.S. at 396–98, 113 S.Ct. at 1499.

 The primary purpose of bankruptcy cases is not to serve as a settlement tool. They are court proceedings which are intended to allow deserving debtors the opportunity to reorganize their chaotic finances, and, as a result creditors can be paid, jobs are saved, and legitimate businesses are salvaged. A debtor has an affirmative duty to propose a plan which complies with the bankruptcy code. *In re Perez,* 30 F.3d 1209, 1213 (9th Cir.1994). Proceedings which constitute a "revolving door" or "merry-go-round" into the courthouse may be considered to be bad faith filings. *See, e.g., In re Gaudet,* 132 B.R. 670 (D.R.I.1991); *In re Gates,* 42 B.R. 4 (Bankr.N.D.Ga.1983); *See also In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir. BAP 1983); *In re Strolrow's, Inc.,* 84 B.R. 167 (9th Cir.1988).

To further bolster the conclusion that the debtor had no intention of settling, upon dismissal of the appeal, it is apparent that no settlement has occurred, that the parties have been engaged in continual contested matters and adversary proceedings, the acrimony from the first case has not abated, and that the essence of the creditor makeup between the first and second cases has not radically changed. The "new" creditors appear only to be unpaid administrative expenses of the first case. A comparison of the creditors in the first and second cases follows:

### DEBTOR'S SCHEDULES

| | FIRST CASE | SECOND CASE | COMMENT |
|---|---|---|---|
| **SECURED** | | | |
| MetLife Life | $1,371,284 | $1,549,850 | |
| Spector Inv. Corp. | $700,000 | $ 763,019 | |
| Defined Benefit Plan | | | |
| Edward L. Kieft | —— | $ 25,000 | |
| Leon Ulan | —— | $ 25,000 | |
| | | | |
| **TAXES** | | | |
| Ariz. Dept. Revenue | —— | $ 1,300 | |
| Pima County | —— | $ 34,224 | |
| Tucson City Tax | —— | $ 650 | |
| I.R.S. | —— | $ 806 | |
| | | | |
| **UNSECURED** | | | |
| Larry Spector | $105,000 | $ 105,000 | |
| Sunland | —— | $ 45,994 | |
| El Sol Roofing | —— | $ 31,831 | |
| Apcon Construction | —— | $ 40,122 | |
| Hall Painting | —— | $ 17,863 | |
| Pro Cleaning | —— | $ 2,232 | |
| Hays Roofing | —— | $ 1,556 | |
| Apperson Plumbing | —— | $ 1,272 | |
| Roofing Analysis | —— | $ 1,005 | |
| Carole Electric | —— | $ 555 | |
| R.D. Landscaping | —— | $ 250 | |
| Arnco | —— | $ 1,110 | |

| | FIRST CASE | SECOND CASE | COMMENT |
| --- | --- | --- | --- |
| Wee Landscaping | — | $ 950 | |
| Tucson Electric | — | $ 805 | |
| Complete Parking Lot | — | $ 300 | |
| D'Antonio Law firm | — | $ 22,224 | |

MetLife argues that the re-filing of this case, on the heels of the voluntary dismissal of the appeal from the order of dismissal in the first case, was tactical in nature. Having been unable to gain confirmation of its plans in its first case, the debtor has simply hired new counsel, pretended the past did not happen, and would like to simply start the case fresh. The debtor has made no mortgage payments to MetLife since March 1, 1993, although, occasionally, some cash collateral has been paid over.

The law concerning dismissals for bad faith filings is extensive. In the Ninth Circuit, the courts have applied that legal principle so that the judicial system is not perverted or abused by those persons or entities who use the process for anything other than its intended purposes. *See, e.g. In re Stolrow's,* 84 B.R. 167 (9th Cir. BAP 1988); *In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir. BAP 1983); *In re St. Paul Self Storage Ltd. Partnership,* 185 B.R. 580 (9th Cir. BAP 1995); *In re Marsch,* 36 F.3d 825 (9th Cir. 1994). Here, the reasons underlying the dismissal of the first case have not been erased by the mere filing of the second case.

Reduced to its essence, this case is a two-party dispute. *See In re Landmark Capital,* 27 B.R. 273 (Bankr.D.Ariz.1983). That several new "unsecured" creditors, relating to the construction trades, sprang up in the four days between the dismissal of the appeal on June 9, 1994, and the new filing on June 13, 1994, indicate that those "creditors" were apparently unpaid administrative claims of the first case, "held in the debtor's hip pocket" for the purpose of creating the illusion that the "new" creditors were more substantial than they really are. It is unlikely that

the debtor can prove that it received construction goods and services, on credit, totalling over $ 115,000 in just four days between the dismissal and the re-filing. Moreover, the Kieft and Ulan secured claims were nonexistent in the first case. Likewise, there have been no changes in the debtor's financial circumstances to justify the filing of the second case. The filing is simply a tactical maneuver, knowing that the court process is lengthy and sometimes slow, designed to gain more time and distance in an effort to wear down its exhausted secured creditor into some type of settlement submission.

Such antics are an abuse, costing litigants good money, and wasting valuable court time. This case is nothing less than an improper extension of the first-dismissed and legally final case. The second filing will not be condoned.

### 2. Inability to Propose a Confirmable Plan

The debtor's new plan seeks to place MetLife's deficiency claim in a separate class from the alleged trade debt. The Ninth Circuit has indicated that such separate classification may be permissible if sufficient valid business reasons support it. *In re Johnston,* 21 F.3d 323 (9th Cir.1994).

The sin of separate classification and separate treatment of an obviously belligerent creditor is that it results in what has become known, in transmutation from a legislative tactic to a term of legal parlance, as "gerrymandering." [1] Thus, the legal technique of gerrymandering, for purposes of § 1129(a)(10), simply means the reconfiguration of creditor classes to suit the dynamics of current Chapter 11 law requiring an impaired consenting class.

---

1. The term "gerrymandering" was first used in 1812, with reference to the tactics employed by Governor Elbridge Gerry, of Massachusetts, whose shameless technique of changing voting boundaries to suit the demographic dynamics favorable to his party resulted in political districts that sometimes resembled salamanders. Hence, the name "gerrymander." It implies improper and unfair manipulation of the letter of the law.

Relative to classification, § 1122(a) states that, except for the administrative convenience class:

> ... a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

Thus, it is appropriate to separately classify different types of claims provided such classification is not unfairly discriminatory. § 1129(b)(2). The Ninth Circuit Court of Appeals has held that such classification is permitted if (1) the claims are substantially similar, and (2) there are good business reasons to support the different classification and/or treatment. *In re Johnston,* 21 F.3d 323 (9th Cir.1994).

The Ninth Circuit has held that the question of whether claims are "substantially similar" within the meaning of § 1122(a) is a question of fact, reviewable under the clearly erroneous standard. *In re Johnston, supra.* In such context, the reasons for different treatment and separate classification must be closely scrutinized. *In re Acequia,* 787 F.2d 1352, 1364 (9th Cir. 1986).

The Bankruptcy Appellate Panel of the Ninth Circuit has provided judicial guidance in connection with resolving this factual issue. Factors to consider are:

(1) is the discrimination reasonably based?

(2) can the debtor reorganize without it?

(3) is the discrimination fair and proposed in good faith, or is it only necessary to create an impaired consenting class? and

(4) is the degree of discrimination directly related to the rationale for the disparate treatment?

*In re Wolff,* 22 B.R. 510, 512 (9th Cir. BAP 1982) (Chapter 13). This rationale articulates the logic behind the Ninth Circuit's *Johnston* decision.

The amounts of the debts owed to the "unsecured" trade creditors are minor compared to the MetLife secured/undersecured claim. That creditor has, by far, the largest stake in the outcome of this case. In effect, the "trade class" was not paid in the previous case in order to create a consenting "class" for purposes of this case.

In short, both the facts and the law require a finding that reasons espoused by the debtor do not justify separate classification and separate treatment of the MetLife deficiency from the so-called trade debt. The attempt to separately classify violates § 1122(a) as well as the "fair and equitable" requirement of § 1129(b)(2) and is, in reality, an improper effort to manipulate the law and engineer an arbitrarily-created impaired class solely for convenience of satisfying the cramdown requirements. Such treatment and separate classification is rejected. *See, also In re Windsor on the River Associates, Ltd.,* 7 F.3d 127 (8th Cir.1993); *In re Boston Post Road Limited Partnership,* 21 F.3d 477 (2d Cir.1994); *In re Greystone III Joint Venture,* 995 F.2d 1274 (5th Cir.1991); *John Hancock Ins. Co. v. Route 37 Business Park Assoc.,* 987 F.2d 154 (3rd Cir.1993); *In re Bryson Properties, XVIII,* 961 F.2d 496 (4th Cir.1992), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *contra Matter of Woodbrook Assoc.,* 19 F.3d 312 (7th Cir.1994).

Finally, the Court must address "good faith" in the context of classification and unfair discrimination. The reality of this case is that it is only a two-party dispute and is an extension of the first case. Impairment, being engineered, is by definition somewhat "artificial." Since the law does not split hairs on the degree of impairment, it is, more properly, a good faith issue. Being only a two-party dispute, the MetLife debt should be modified outside of the bankruptcy process. *In re Landmark Capital,* 27 B.R. 273 (Bankr.D.Ariz.1983).

For those reasons, the Court finds that the classification described for the MetLife undersecured creditor's claim is improper, and but for such classification, the debtor would be unable to present an impaired consenting class voting in favor of its plan.

Therefore, the Plan fails to satisfy §§ 1129(a)(1), (3), (8), and (10). Thus, as in its prior case, the debtor is unable to present a plan which will resolve this essentially two-party dispute.

In response, the debtor asserts that its first attorney improperly advised them. This is a matter to take up with that counsel or that counsel's professional liability carrier. The debtor went the distance with that attorney in the first case, from filing through plan proposals, through dismissal and through the initial steps of an appeal. The debtor, now here with a new filing and new counsel, cannot alter history. It must live with its previous legal decisions. *See Pioneer Inv. Services Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The debtor had 14 months in the first case to confirm either of its two plans, and failed; it appealed the dismissal order, and then abandoned the appeal, rendering final the order of dismissal in the first case. The new case now attempts to present a "revisionist history" of the first case, slanting facts differently, bobbing and weaving its way to hoped-for new life here. But the debtor, again using boxing metaphors, is out on its feet.

The new case has been before the court, and the debtor has had the benefit of court protection, for fifteen months. It is time for that protection to end.

### 3. Disobedience of Court Orders

MetLife has contended that the debtor, in this and the prior case, misused estate funds. The rulings and findings in the first case, with regard to these matters, are *res judicata. See* Order of February 23, 1994. (Case No. 1, Dkt. 108).

With regard to the second case, the court is not convinced that the debtor intentionally misused or misappropriated funds, or intentionally violated court orders. However, in actuality, the court has, upon review of the debtor's financial information, found the debtor to have generally complied with its obligations to report accurately on the status of its finances. Currently, the debtor has, through July 1995, the sum of $368,677.85 in the bank, which it is holding subject to further proceedings in this Court (Dkt. 150). Of more importance to the court is the return, if necessary, of funds which may have been improperly paid out and which are delineated "cash collateral." In that regard, the court

will retain jurisdiction to gain a complete accounting of funds in order to ascertain whether such funds were improperly disbursed to any person or entity, and whether those funds should be returned to the estate.

### RULING

1. All stays are lifted, immediately;
2. MetLife's *Motion for Dismissal* is granted, and an order of dismissal will be entered by separate document.