**In re DISTRIGAS CORPORATION, Debtor.**

**Bankruptcy No. 85–1082–L.**

United States Bankruptcy Court, D. Massachusetts.

Sept. 26, 1986.

Frederick G. Fisher, Jr., P.C., Judy A. O'Neill, Hale & Dorr, Boston, Mass., for debtor.

Ross A. Lewin, Deputy Atty. Gen., Trenton, N.J., for State of New Jersey Dept. of Environmental Protection.

Peter A. Fine, Choate, Hall & Stewart, Boston, Mass., (Local counsel), Donald L. Cuneo, Stuart D. Sender, Marjorie Miller, Shearman & Sterling, New York City, for Sonatrach.

## MEMORANDUM DENYING CONFIRMATION

HAROLD LAVIEN, Chief Judge.

When the Cabot Corporation decided to enter the business of importing and distrib-

uting LNG, liquified natural gas, it did so by creating two wholly owned corporations. The debtor, Distrigas Corporation, whose only function was to hold the licensing authority to import the LNG from Algeria, which it carried out by way of a contract with Societe Nationale Pour la Recherche, la Production, le Transport, la Transformation et la Commercialisation des Hydrocarbures ("Sonatrach"). The debtor owned no facilities and had only one customer, its sister corporation, Distrigas of Massachusetts Corporation ("DOMAC"), to whom it "sold" (transferred might be a better word, since this was allegedly a no profit transaction) all of its LNG. In fact, it was Domac that had all of the storage, processing and distribution facilities and who held the contracts with the actual purchaser user.

Neither the parent, Cabot Corporation, nor the real operating sister corporation, DOMAC, have filed in bankruptcy. The debtor's only asset is $12,400,000 it was paid by DOMAC, plus interest for the last shipment of LNG which, in turn, is owed to Sonatrach, the debtor's supplier. The debtor also owns land in New Jersey which would have an estimated value of $2,500,000 if not for the toxic waste clean-up problem created by its previous owners. Probably another potential asset is the claim by the debtor against the previous owner for reimbursement of part or all of the clean-up costs and $161,256.73 owed by debtor's parent, the Cabot Corporation.

The schedules list five creditors other than Sonatrach, consisting of two law firms, totaling $11,893.77, part of which is estimated, a debt of $2,981.00 for consultation services, the State of New Jersey, and, peculiarly, an inter-company charge by DOMAC that, admittedly, disappears if operations continue. In any event, with over $12,000,000 in the till, it hardly seems that these claims have any real reason for existence other than to add a facial argument that this entire proceeding is something more than a simple dispute between the debtor or the Cabot interests and Sonatrach. A dispute occasioned by a desire on the one side to avoid a burdensome contract, now that gas prices have dropped and the government has relieved the ultimate purchasers from their commitments to purchase from DOMAC at above market prices and at larger than needed quantities. This Court has previously allowed the debtor to reject the contract with Sonatrach as unduly burdensome, as a matter of business judgment. The last shipment occurred in August of 1985. The debtor has neither received nor sold any LNG since then.

Sonatrach seeks damages for the breach of its contract in the amount of $1,839,990,000.00 or $1,262,900,000.00 in 1985 dollars, discounted to present value at a rate of 6%, which is the contract price for the 14 cargoes of LNG which should have been made by Sonatrach to the debtor in 1985, and 14 shipments per year for the next 13 years which Sonatrach claims under its contract with the debtor.

Since February 1986, the debtor has submitted four versions of a potential plan, all of which require as a sine qua non, a new source of LNG and Domac's ability to find sufficient customers. Recently the plan has purported to have two classes of creditors. Class I, the State of New Jersey, which has filed both as a secured and unsecured claim in an unspecified amount for clean-up of the toxic waste based on its state statute, N.J.S.A. 58:10–23.11 to 58:10–23.11 to 58:10–23.24, 58:10–23.34, familiarly known as the Spill Act, and the federal environmental clean-up statute, 42 U.S.C. § 9607 familiarly known as CERCLA. Class II, the remaining unsecured creditors which, whether in reality is only Sonatrach, or not, is clearly dominated by Sonatrach.

Sonatrach objects to confirmation and has moved for dismissal of the Chapter 11, or a conversion to Chapter 7.

■ In order to have a confirmable plan, if there is an impaired class, there must be at least one actual consenting impaired class, 11 U.S.C. § 1129(a)(10).

(a) The court shall confirm a plan only if all of the following requirements are met:

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

Impairment's meaning is spelled out in 11 U.S.C. § 1124 and has, generally, come to mean in its most basic form any material alteration of the holder's legal, equitable, or contractual rights, unless payment in cash of the allowed amount of claim is made on the effective date of the plan.[1]

Clearly, Class II is impaired since Sonatrach's contract has been rejected and, therefore, considered as breached just prior to filing. 11 U.S.C. § 502(g). While the plan calls for the payment of $12,400,000 for the last shipment, it does not provide for damages caused by the breach and, in fact, seeks to defend against all or part of the liability based on theories of frustration and performance excused for reasons of force majeure. Under the contract, the dispute would be resolved by arbitration in Switzerland which Sonatrach has tried to insist upon and which the debtor seeks to avoid by bankruptcy and the rejection of the contract. Sonatrach's contractual rights are clearly being materially altered. Sonatrach has rejected the plan and, therefore, Class II has rejected. The only possibility left to the debtor is to consider the potential of a cram down, which requires the acceptance of one impaired class.

Class I consists solely of the State of New Jersey which has not only accepted the plan, but has entered into an extensive Administrative Consent Order with the debtor relative to a complete resolution between the parties of the toxic waste problem, so that the threshold issue turns on New Jersey's status. Can New Jersey be considered a class and, if the type of claim that it has constitutes a class, is it an impaired class?

Here, two important governmental concerns appear to be in conflict. On the one hand, bankruptcy's interest in reorganization and a fresh start based on discharge of pre-filing obligations and the abandonment or rejection of burdensome property or contracts, and stays, automatic and otherwise, needed to accomplish that result. On the other side is a strong and growing recognition of society's interest in protecting the environment and the health and safety of the inhabitants thereof. This latter goal has been provided for in the exempting of the exercise of police power from the automatic stay in 11 U.S.C. § 362(b)(4) & (5) and, as to discharge, 11 U.S.C. § 523(a)(7), and such state statutes as New Jersey's Spill Act and the Congressional CERCLA.

These competing interests have been examined by the Supreme Court in two fairly recent cases, *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); *Midland National Bank v. New Jersey Department of Environmental Protection*, — U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859, 13 B.C.D. 1262 (1986), *rehearing denied*, — U.S. ——, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986). If there is any unifying thread apparent in these decisions, it is that the two major objectives are both important and to the extent possible, should be reconciled. An economic fresh start can only be meaningful and continue to flourish in a safe environment. Although pre-filing judgments may be discharged, in bankruptcy, clean-up orders are fully enforceable as would be an appropriate lien on the property which may even have priority, if necessary, over other secured claimants to the extent of available assets. The trustee cannot duck his responsibility for clean-up by abandoning the burdensome property.

* * * * * *

1. § 1124. Impairment of claims or interests

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim;

Now, how does all of this apply to the matter at hand? The debtor, somewhat oddly, is vigorously defending New Jersey's position, apparently, in the belief that only by conceding to New Jersey a valid impaired claim, [in its initial plan of March 27, 1986, it described New Jersey's claim as unimpaired] can it have any potential for carrying out its plan of reorganization. New Jersey, up to the time of the filing, indeed, even to this point, has merely sent a letter to the debtor in an effort to enforce its clean-up powers. New Jersey has neither commenced formal action nor activity to compel the debtor to clean up the toxic waste left by Koppers Company, the previous owner, who creosoted poles on the property, nor has the state spent any of its own money in any clean-up effort. The debtor and New Jersey argue that New Jersey holds a contingent claim under the definition of claims in 11 U.S.C. § 101(4).[2] Asserting that since all of the contamination occurred pre-filing, then, under both the New Jersey Spill Act and the Federal CERCLA Act, New Jersey can order clean-up or do it itself and seek reimbursement and, at least, under the New Jersey Act, obtain a lien to reimburse money spent after such expenditure. Under this analysis, New Jersey would seem to hold an allowed claim under 11 U.S.C. § 502 and thereby be entitled to vote under 11 U.S.C. § 1126(a).[3] New Jersey joins in the contention that it is at least a contingent secured creditor under the Spill Act and further argues that it is an unsecured administrative creditor to the extent that the property is inadequate to pay the full costs.[4]

Sonatrach argues that although New Jersey has definite rights, they may never ripen into a claim since Koppers may assume the responsibility, or the debtors, after being ordered to do so, having more than sufficient assets, may be expected to do the clean-up. In any event, nothing was due at the moment of filing and any claim for reimbursement and any costs incurred by the debtor in cleaning up the waste would be an administrative claim. *See, In re M. Frenville Co.,* 744 F.2d 332 (3rd Cir.1984); *French v. Morse,* 68 Mass. (2 Gray) 111, 115 (1885), distinguishing demands whose existence depend on a contingency from existing demands, the cause of action upon which depend on a contingency.

Whether such cause of action would ever exist was uncertain and contingent at the time when the defendant went into bankruptcy, and also at the time when he was discharged. At neither of those times had the plaintiff any existing demand upon which the cause of action depended on a contingency; but the very existence of his demand depended on a contingency.

Congress never intended administrative claims to vote on the plan and illustrated that intent by specifically excluding admin-

---

**2.** § 101. Definitions

In this title—

(4) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

**3.** § 1126. Acceptance of plan

(a) The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan. If the United States is a creditor or equity security holder, the Secretary of the Treasury may accept or reject the plan on behalf of the United States.

**4.** The proof of claim filed by New Jersey contains no amount as well it could not as of this date. I will not prolong the memorandum by delving into the language of the New Jersey Spill Act which, as interpreted by its own courts, *See, State Department of Environmental Protection v. Ventron Corp.,* 182 N.J.Super. 210, 440 A.2d 455 (N.J.Super.App.Div.1981), may raise the question of liability of the nonpolluter, or the factual question of what pollution took place during a period that the debtor leased the property back to Koppers for the winding up of its operation. Nor, will we deal with, at this time, the related question of primary and secondary liability. *See United States of America v. Maryland Bank & Trust Company,* 632 F.Supp. 573 (D.Md., 1986).

istrative claims as constituting a class. 11 U.S.C. § 1123(a)(1),

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
> (1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(1) [administrative claims], 507(a)(2), or 507(a)(7) of this title, and classes of interests; [italics added]

This is further buttressed by 11 U.S.C. § 1129(a)(9)(A) calling for the treatment of administrative claims and referring to them as claims, while the same section goes on in subsection (B) to deal with classes where other claims fit into classes. The Congressional plan is clear. While classes may be affected by the plan, priority claims must be paid in full and, therefore, cannot be impaired by the plan. Thus, we can see the Congressional plan. Those whose claims the debtor may be able to alter under the plan, should have an opportunity to vote while those whose claims have to be paid in full, in cash, on the effective date of the plan, have no interest at stake and, therefore, need not be a voting class.

A basic rule of statutory construction is that each provision should, if possible, be given effect so as to carry out the Congressional intent while making the entire Act a consistent whole, *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974), citing the following language from *Brown v. Duchesne,* 60 U.S. (19 Howard) 183, 194, 15 L.Ed. 595 (1857):

> When interpreting a statute, the court will not look merely to a particular clause in which general words may be used but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the legislature ...;

*See, Govoni v. Bricklayers Union,* 573 F.Supp. 82 (D.Mass.1983).

The words "class" and "claim" are not used interchangeably but are both words of art and Congress is presumed to have understood the difference and intended that they be given their appropriate meaning. *See, Harman v. New Hampshire Savings Bank,* 638 F.2d 280 (1st Cir.1981) dealing with Congress' use of particular language.

The objective of a consistent statutory meaning, meeting the Congressional intent, while preserving the important vital interests of both New Jersey's environmental concerns and a consistent application of the reorganization provisions, can be readily accomplished in this matter.

New Jersey does have important interests in protecting its citizens and the environment from toxic waste on the debtor's New Jersey property and nothing that bankruptcy can do, can force on New Jersey by way of a Chapter 11 plan, any diminution of those rights. New Jersey is not bound by the automatic stay, 11 U.S.C. § 362(b)(4) & (5), and can proceed regardless of the debtor's Chapter 11 to order the debtor to clean up the property or clean it itself and obtain a lien on the debtor's property to reimburse itself, provided it could do so under appropriate law had there been no bankruptcy. To the extent it would seek reimbursement, it would, under the Supreme Court's *Midland National Bank v. New Jersey, supra,* decision, obtain a first priority administrative claim that could come even before a prior secured creditor, should that be necessary. However, in the case before us, such drastic results would be unnecessary since the debtor holds the New Jersey real estate, as well as $12,400,000 in cash, which nobody contests as being more than adequate for any clean-up. The New Jersey courts have rationalized the expense as really being a quid pro quo; namely, that the property had either little or no value until the clean-up which enhanced its value, *Kessler v. Tarrats,* 191 N.J.Super 273, 466 A.2d 581 (1983) *aff'd,* 194 N.J.Super. 136, 476 A.2d 326 (1984). It, therefore, would fit the classic definition of an administrative expense. 11 U.S.C. § 503(b)(1)(A). Thus, New Jersey has a contingent administrative claim within the definition of 11 U.S.C. § 101(4) and could object under 11 U.S.C.

§ 1126(a) to any plan that did not afford it the treatment due under 11 U.S.C. § 1129(a)(9)(A), otherwise, it is not a voting class under 11 U.S.C. § 1123(a)(1). Likewise, as to its claim to alleged secured creditor status, we are dealing with a condition precedent. New Jersey's claim is merely contingent until it expends funds. Until that time, any claim to a lien is, at best, inchoate, but once the condition precedent is met and the proper filings are made, the effect would be governed by existing law unaffected by bankruptcy. Note, that in *Midland v. New Jersey, supra*, the Supreme Court said that the trustee could not even exercise what had been thought to be a long standing basic right of the trustee, namely, to abandon a burdensome asset. A fortiori, if the trustee could not abandon the property, he could not in any other way remove the property from New Jersey's claim.

Thus, New Jersey has a contingent administrative or, possibly, secured claim. It is not the type of a pre-filing claim that allows it to be constituted a class. However, it is entitled to administrative claim treatment and none of its nonbankruptcy statutory rights are affected by bankruptcy (Note, we are not dealing in this case with anything that might be considered a consensual right). Therefore, it is not, and cannot be, impaired by the plan.

It should further be noted that 11 U.S.C. § 1129(a)(9) dealing with the treatment of administrative claims, would answer any complaint by New Jersey that the plan purports to change some of its rights. Aside, of course, from the legal ineffectiveness of any such attempt, New Jersey has not only failed to object to the plan, it has voluntarily signed an Administrative Consent Order waiving, by agreement, what it otherwise could not be compelled to do by the debtor. 11 U.S.C. § 1129(a)(9) expressly provides for such waiver:

> Except to the extent that the holder of a particular claim has agreed to different treatment of such claim, the plan provides that—

As a contingent administrative claimant, New Jersey has voluntarily waived some of its rights but that doesn't allow them to claim impairment. Free choice is not synonymous with compulsion.

Since Class Two has voted overwhelmingly to reject the Plan, and debtor has not obtained acceptance of the Plan by any impaired class of claims that is not an insider, the requirements of the Bankruptcy Code Sections 1129(a)(8) and (10) are not satisfied and the Plan cannot be confirmed. Since this case is, in essense, a dispute between the debtor and the major, if not the only real creditor, without resolution of that dispute, there is no likelihood of any confirmable plan.

Debtor submitted its first Plan of Reorganization on February 28, 1986. Since that time, debtor amended its Plan four times, resulting in the Plan, as supplemented by the Preliminary Statement. On April 9th, with a hearing on its initial disclosure statement scheduled for April 18th, the First Amended Plan and Disclosure Statement were filed; both the initial and amended disclosure statements were described by the Court as gossamer thread calling for a liquefaction facility in Lake Charles, Louisiana, with no details to support financing, leasing, transportation or suppliers. The Court considered the information vague but, considering the sophistication of all of the parties, approved the disclosure statement on condition that by May 23rd, debtor provide supplementary information.

(a) details pertinent to the sources of necessary financing for the construction of a liquefaction plant in the Lake Charles region of Louisiana and sources of the Liquefied Natural Gas ("LNG") for spot purchases by the Debtor prior to the construction of such plant;

(b) a valuation analysis supporting the purchase price of the stock of the reorganized Debtor in the Plan; and

(c) projections of the amounts to be deposited in and to be distributed from the five year fund consisting of .10 per each MMBTU of LNG as provided in the plan

. . . .

In addition, the Court set June 10, 1986 as the date of the confirmation hearing. That date was later adjourned to July 21, 1986.

On May 23, 1986, debtor produced a set of Supplemental Disclosure Materials ("Materials") which revealed little more than did the plan and disclosure statement, themselves.

For example, whereas the Court had specifically required, by its May 2 Order, that debtor provide details pertinent to the sources of financing for the Lake Charles plan, debtor merely provided in Exhibit 9 of its Materials, a letter from the bank that concluded:

Naturally, this letter should not be viewed as a commitment by Morgan to provide financing for this project and a significant amount of analysis and review will be necessary before such a commitment could be delivered.

No information was supplied as to (b) and (c).

On July 8, 1986, 13 days before the rescheduled hearing on confirmation, debtor filed its First Amended Plan as Modified. This new version of the plan indicated that debtor would attempt to purchase LNG from Alaska or other sources outside the contiguous 48 states for the period during which the Lake Charles plant was under construction. Debtor never has produced any details for either Alaska or Lake Charles.

By this time, the hearing on confirmation had been postponed until August 6, 1986.

Under the consent agreement between Debtor and New Jersey, signed July 29, debtor agreed to perform an assessment of clean-up costs as well as the actual clean-up of the property and New Jersey was to receive a non-recourse mortgage on the property. After debtor signed the agreement, New Jersey cast its ballot for acceptance of the plan. Thus, by putting New Jersey and Sonatrach in separate assertedly impaired classes, and obtaining New Jersey's vote by agreeing to liability, the debtor claimed an assenting class.

At the August 6, 1986 confirmation hearing, this Court raised several threshold issues regarding New Jersey's role in this proceeding which, in the Court's view, if resolved against debtor, precluded the need for a confirmation hearing. Thus, the Court issued a briefing schedule on the various issues relating to New Jersey and stated that it would continue the matter to allow debtor one further opportunity to:

provide in writing a specific, concrete plan as to where the money is coming from, what it is you are going to do, how you're going to distribute, who you're going to sell to, and show me a real, solid proposal that this business is something that is viable and not a mere bargaining tool to try and get Sonatrach or somebody else to make a deal with you sometime in the future. Now how much time do you need to present a solid proposal?

Counsel asked for four weeks and was given from August 6 to September 8 to file a solid proposal.

On September 8, 1986, debtor's fifth reorganization proposal was filed. It did not mention Lake Charles LNG, nor did it involve Alaskan LNG. It included a totally new notion, a purported contract entered into between Total International, Ltd. ("Total") and debtor, whereby Total would sell LNG to debtor under terms to be negotiated later. Again, the contract with Total left quantities open and contained no agreement as to price. Debtor did not provide any contracts or commitments from customers for its LNG.

Although it is not essential to the Court's determination, the parties have briefed and argued the matter and the Court considered the feasibility and substance or lack thereof of the proposed plan. Debtor's Preliminary Statement fails to meet this threshold of facial feasibility. Instead, it introduces a new set of uncertainties.

The pricing provisions of debtor's agreement with Total International, Ltd., sections 6.1 and 6.2, provide only that the parties shall attempt to negotiate an agreement as to price.

Debtor has presented no evidence from which it can be determined whether Total International, Ltd., has LNG and transportation in sufficient quantities available to sell debtor in light of its other commitments.

On September 15, 1986, debtor presented a contract between its sister company, Distrigas of Massachusetts Corp., ("DOMAC") and Providence Gas, for the possible purchase of 0.4 TBTU of LNG at a price not to exceed $5 per MMBTU, which is contingent upon, among other things, Providence Gas being able to resolve the necessary transportation. Debtor has failed to present any other evidence of commitments to purchase LNG from DOMAC on any evidence of how much LNG it would need to simply break even.

Debtor's earlier alternative proposal to construct a liquefaction facility at Lake Charles, Louisiana, requires financing for which debtor has been unable to obtain a commitment. Similarly, debtor has not presented any evidence in either the preliminary statement or counsel's statements to the Court that it can obtain the commitments necessary to even carry out its proposal to purchase LNG from Total International, Ltd., were a firm agreement to be negotiated.

Debtor has not provided in its preliminary statement or counsel's statements to the Court evidence from which the Court may determine that the debtor would break even or be profitable under the Plan.

After five attempts over a period in excess of six months, debtor has failed to present anything more than an illusory plan. Accordingly, debtor is unable to satisfy the requirements of Bankruptcy Code Section 1129(a)(11). The Plan, even if the threshold problem could be overcome, cannot be confirmed.

 Debtor argues that given more time, it could flesh out its proposal; however, without an available impaired class willing to vote for a plan, there is little point in spending more time on the plan. The Court notes, however, that debtor has demonstrated, over six months and five attempts, that it has been unable to present a confirmable business plan, even after being accorded numerous opportunities. A further continuation of the confirmation hearing would not be in the interests of the creditors and the estate.

IT IS HEREBY ORDERED THAT:

Confirmation of the Plan is denied, and a hearing on Sonatrach's Motion to Dismiss or whether to convert this proceeding to a Chapter 7 proceeding was scheduled for Thursday, September 25, 1986 at 2:00 P.M., at which time the hearing was continued to October 23, 1986 at 2:00 P.M.