**In re BOSTON POST ROAD LIMITED PARTNERSHIP, Debtor.**

**BOSTON POST ROAD LIMITED PARTNERSHIP, Plaintiff–Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant–Appellee,**

Evergreen Landscape; Boyer Realty Mgmt; Flanagan Assoc. Appraisers; Tinnerello Rubbish Removal; Gottesdiener Accounting; and Water Pollution Control, Town of Waterford, Creditors,

**Honor S. HEATH, Trustee.**

No. 1219, Docket 93–5082.

United States Court of Appeals, Second Circuit.

Argued March 1, 1994.

Decided March 30, 1994.

Raymond L. Baribeault, Jr., New London, CT (S. Joel Suisman, Andrew J. Brand, Suisman, Shapiro, Wool, Brennan & Gray, of counsel), for plaintiff-appellant.

Walter E. Paulekas, Hartford, CT (Levin & D'Agostino, of counsel), for defendant-appellee.

Before: KEARSE and LEVAL, Circuit Judges and POLLACK, District Judge.*

MILTON POLLACK, Senior District Judge:

Debtor seeks confirmation of a Plan of Reorganization filed under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court denied confirmation, holding that the Plan impermissibly (i) separately classified similar claims solely to create an impaired assenting class; and (ii) classified as "impaired" a class of residential security depositors whose interests were in fact benefitted by the Plan. The District Court affirmed the Bankruptcy Court's rulings on both issues. Debtor challenges both holdings.

## BACKGROUND

Plaintiff–Appellant, Boston Post Road Limited Partnership ("BPR"), is a limited partnership formed pursuant to the Connecticut Uniform Limited Partnership Act, Conn. Gen.Stat. §§ 34–9 to –82 (1993), consisting of a single individual general partner, George Boyer, and a single limited partner, George Myers. BPR was formed in 1984 to acquire and manage a residential and office complex located in Waterford, Connecticut. In March of 1988, BPR mortgaged the complex to Connecticut Bank and Trust Company ("the Bank") to secure a loan of approximately $1.6 million. BPR thereafter defaulted on the mortgage payments, and on July 20, 1990, the Bank instituted a mortgage foreclosure action in Connecticut state court. In January 1991, the Bank became insolvent, its assets were seized by the U.S. Comptroller of Currency, and the Federal Deposit Insurance Corporation ("FDIC") became the holder of BPR's mortgage.

The FDIC continued to pursue foreclosure of the mortgaged property and on August 1, 1991, the Connecticut Superior Court entered a judgment of strict foreclosure against BPR

* The Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

and set October 28, 1991 as BPR's last day for redemption. On that date, BPR filed a voluntary *pro se* petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, thereby staying foreclosure. Approximately six months later, on March 16, 1992, the FDIC filed its proof of claim in BPR's bankruptcy.

On June 18, 1992, BPR filed its Second Amended Plan of Reorganization (the "Plan") in the Bankruptcy Court. The Plan proposed the following seven classes of creditors:

Class 1—unsecured claims of residential tenants to security deposits entitled to priority under Section 507(a)(7) of the Bankruptcy Code;

Class 2—secured claims held by creditors with liens and/or security interests on or in the real estate asset of the debtor (i.e., the secured portion of the FDIC's mortgage);

Class 3—secured interests of residential tenants whose security deposits are being held by the Debtor in interest-bearing bank accounts;

Class 4—unsecured claims of trade creditors;

Class 5—unsecured deficiency claims of creditors who have some security for their debt but not enough to cover the full amount owed (i.e., the unsecured portion of the FDIC's mortgage);

Class 6—interests of the limited partner; and

Class 7—interests of the general partner.

In relevant part, the Plan proposed to pay the FDIC's secured claim (Class 2), estimated at $1.445 million, over a fifteen-year term, utilizing negative amortization with a balloon payment at the end of the fifteenth year following confirmation of the Plan; to pay the trade creditors' unsecured claims (Class 4), totalling approximately $5000, over a six-year term without interest; to pay the FDIC's unsecured mortgage deficiency claim (Class 5), estimated at $500,000, without in-

terest following the earlier of a sale of the property or the fifteenth year following Plan confirmation;[1] and to pay the residential security deposit holders (Class 3) a rate of interest on their residential security deposits *higher* than that statutorily mandated. In essence, the Plan was fashioned to permit a possible "cramdown" under 11 U.S.C. § 1129(b), over the anticipated objections of the FDIC, by far BPR's largest unsecured creditor. Ultimately, Class 1 turned out to be non-existent; Classes 2 and 5 voted to reject the Plan; and Classes 3, 4, 6 and 7 voted to accept the Plan.

On August 12, 1992, the Bankruptcy Court (Robert L. Krechevsky, Chief B.J.) held a hearing on the Plan's confirmation. At the hearing, the FDIC challenged the Plan on several grounds. In particular, it faulted the Plan for (i) segregating the Class 4 unsecured trade debts from the unsecured mortgage deficiency claim of the FDIC solely to gerrymander an impaired class which would approve the Plan; and (ii) classifying as "impaired" the Class 3 residential tenants with security deposits who would receive a *higher* interest rate on their security deposits than the statutorily mandated rate.

After hearing initial arguments, the Bankruptcy Court requested briefs and thereafter rendered a decision denying confirmation of the Plan on October 2, 1992. In its decision, the Bankruptcy Court held that (i) the FDIC's unsecured claim should have been placed in the same class with other unsecured creditors; and (ii) the residential security deposits were not "impaired" within the meaning of Bankruptcy Code § 1124(1). In light of these two rulings, the Code requirements for Plan confirmation were not satisfied because the Plan failed to obtain an affirmative vote of a legitimately impaired class of non-insider creditors. The District Court affirmed on June 23, 1993, and the Debtor has appealed to this Court.

## DISCUSSION

A plan of reorganization under the Bankruptcy Code may be confirmed if either of

---

1. During the hearing on approval of the debtor's disclosure statement, the FDIC chose to have the deficiency (excess of debt over the value of the property) treated as a separate unsecured claim. *See* 11 U.S.C. § 1111(b)(2).

two voting requirements is met: (i) each class of impaired claims has accepted the Plan, 11 U.S.C. § 1129(a)(8); or (ii) "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The latter makes available a "cramdown" procedure. If the debtor chooses to utilize the cramdown procedure (having failed to secure the vote of all the impaired classes), the plan must meet all of the statutory requirements enumerated in § 1129(b) (essentially that the plan is fair and equitable and does not discriminate unfairly against any impaired claims), in addition to the prerequisites of § 1129(a) which are imposed on every plan.

The voting structure set forth in the Bankruptcy Code for approval of a reorganization plan mandates that claims be placed in classes and that votes be counted on a class basis. Acceptance by a particular class of creditors occurs when "at least two-thirds in amount and more than one-half in number of allowed claims of such class ... have accepted ... such plan." 11 U.S.C. § 1126(c).

Cramdown of a plan of reorganization involving claims secured by real property owned by the debtor also often implicates Sections 506(a) and 1111(b) of the Bankruptcy Code. Section 506(a) provides that a claim secured by a lien on property is considered secured up to the value of such property and unsecured for the remainder. In this case, the FDIC's claim, totalling $1,945,000, is secured by the Debtor's sole asset, a residential and office complex. The value of the property, as agreed to by Debtor and the FDIC, is $1,445,000. Thus the FDIC has a secured claim in the amount of $1,445,000 and is entitled to an unsecured deficiency claim for the remaining $500,000. Under Section 1111(b)(2), a secured creditor may elect to have its entire mortgage claim treated as secured notwithstanding Section 506(a), thereby waiving its entitlement to an unsecured deficiency claim and increasing the amount of its secured claim. Here, however, the FDIC did not make such an election and the time to do so has expired.

In a typical single asset real estate case such as this, the mortgagee creditor often objects to the proposed plan, thereby requiring the debtor to seek cramdown of the Plan over the mortgagee creditor's objection. Here the Debtor took two approaches in an attempt to obtain a consenting class of "impaired" creditors. First, Debtor classified the FDIC's unsecured mortgage deficiency claim of $500,000 separately from unsecured trade claims, which total only $5,000. If the deficiency claim were classified together with the other unsecured claims, the FDIC's vote against the Plan would preclude acceptance by that class. This is so because the amount of the FDIC's deficiency claim is one hundred times the amount of all other unsecured claims, making it impossible for Debtor to obtain the affirmative vote of two-thirds in amount of such class as required by Section 1126(c) of the Bankruptcy Code. Debtor's second approach to obtaining a consenting class of "impaired" creditors was to create a purportedly impaired class of residential tenants who placed security deposits with Debtor (Class 3). The Plan provided that holders of such claims would receive interest on their security deposits at a rate of 8% rather than the 5¼% mandated by Connecticut state law. Debtor asserted that this "enhancement" of that class' claims constituted "impairment" within the meaning of Section 1124.

Debtor contended that the approval of each of classes 3 and 4 satisfied the requirement of consent of an impaired class. (The consent of classes 6 and 7, the general and limited partners, could not be counted because these were insider classes.) Both the Bankruptcy Court and the District Court held (i) classifying the FDIC's unsecured mortgage deficiency claim separately from the unsecured claims of trade creditors solely to create an assenting allegedly impaired class was impermissible; and (ii) the class of claims comprising residential tenants with security deposits was not properly classified as impaired, because the value of such claims was enhanced—not impaired—under Debtor's Plan. These rulings precluded Debtor from obtaining acceptance of its Plan by an impaired class of claims, and thereby precluded cramdown. Debtor challenges both holdings on appeal.

A. Separate classification of the several unsecured claims was without a legitimate reason.

■ Section 1122 of the Bankruptcy Code generally governs classification of claims. Section 1122 provides:

§ 1122. Classification of claims or interests.

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122 (1993). While the section bars aggregating dissimilar claims in the same class, it does not explicitly address whether similar claims *must* be placed in the same class. This issue of the permissibility of separate classification of similar types of claims is one that has yet to be addressed by the Second Circuit, and it remains a "hot topic" both among practitioners and in the academic community. *See* Peter E. Meltzer, *Disenfranchising the Dissenting Creditor Through Artificial Classification or Artificial Impairment,* 66 Am.Bankr.L.J. 281 (1992).

In addressing this question, the Bankruptcy and District Courts in the instant action were guided by the holdings of several other circuits, in decisions cited *infra,* that similar claims could not be placed in different classes solely to gerrymander a class that will assent to the plan. *See In re Boston Post Road Ltd. Partnership,* 145 B.R. 745, 748 (Bankr. D.Conn.1992) ("The courts . . . have uniformly prohibited a debtor from classifying similar claims differently in order to gerrymander an affirmative vote in favor of a reorganization plan."); *In re Boston Post Road Ltd. Partnership,* 154 B.R. 617, 621 (D.Conn.1993) ("classes may not be manipulated so as to gerrymander the voting process and circumvent the § 1129 requirements"). The other circuits have generally held that separate classification of similar claims is permissible only upon proof of a legitimate reason for separate classification, and that separate classification to gerrymander an affirmative vote is impermissible. *See, e.g., Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III),* 995 F.2d 1274, 1279 (5th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

Debtor contends that the Second Circuit should decline to follow the leads of the other circuits. It urges that Section 1122 be interpreted to permit far more liberal separate classification of similar claims. Debtor attempts to support its contentions with reference to recent judicial interpretations of Section 1122, legislative intent, and policy considerations.

Debtor first cites two recent opinions by bankruptcy judges holding that separate classification of similar claims is in fact mandated. *See In re D & W Realty Corp.,* 156 B.R. 140, 141 & n. 3 (Bankr.S.D.N.Y.1993) (holding that "separate classification is not only appropriate, it is in fact mandated by the Bankruptcy Code and Rules," but acknowledging that it "has not found [this opinion] articulated anywhere else"), *rev'd,* 165 B.R. 127 (S.D.N.Y. Feb. 22, 1994); *In re SM 104, Ltd.,* 160 B.R. 202, 218–19 (Bankr. S.D.Fla.1993) (holding that unsecured deficiency claims created by § 1111(b) are not substantially similar to other unsecured claims, while asserting that the "circuit courts and the majority of district and bankruptcy courts have missed the forests for the trees").

Debtor then notes that the wording of Section 1122 does not require that all unsecured claims be classified together, but merely states that only claims that are substantially similar *may* be placed together. Debtor contends that this wording, especially when compared with the less flexible wording of the Bankruptcy Act of 1898, reflects Congress' intent to dispense with the requirement that similar claims be classified together.

Finally, Debtor contends that prohibiting separate classification effectively bars the debtor in single-asset cases from utilizing the cramdown provisions of the Code. In single-asset bankruptcy cases, the creditor-mortgagee usually has an unsecured deficiency claim, which, if placed in the class containing other unsecured claims (usually trade debt), will often overwhelm the class. Consequently, the mortgagee will control the vote of the class and the debtor will be unable to present an impaired class to approve the plan. Debtor suggests that such an outcome creates a "conflict of interest": the mortgage creditor will vote its deficiency claim primarily to protect its interests as a secured creditor, whereas only those creditors who have truly unsecured claims should be the spokespeople of the unsecured class.

Debtor's arguments in support of its suggested interpretation of § 1122 are unavailing. First, the ruling in *In re D & W Realty Corp.*, 156 B.R. 140 (Bankr.S.D.N.Y.1993) was reversed on appeal. *In re D & W Realty Corp.*, 165 B.R. 127 (S.D.N.Y. February 22, 1994). The ruling in *In re SM 104, Ltd.*, 160 B.R. 202 (Bankr.S.D.Fla.1993), runs counter to the overwhelming weight of judicial authority. All the circuit courts that have heretofore visited the question of when similar claims may be classified separately have held that similar claims may not be separately classified solely to engineer an assenting impaired class:

[I]f § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims. *Greystone III*, 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992);

[A]lthough separate classification of similar claims may not be prohibited, it "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 502 (4th Cir.) (quoting *Greystone III*, 995 F.2d at 1279), *cert. de-*

*nied*, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992);

[I]f the classifications are designed to manipulate class voting ..., the plan cannot be confirmed. *Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir.1990);

The debtor's discretion to place similar claims in different classes is not unlimited, however. Classifications designed to manipulate class voting must be carefully scrutinized. There is potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one class of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions. *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987);

Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class. *Teamsters Nat'l Freight Industry Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 586 (6th Cir. 1986).

Indeed, some courts have gone even further, holding that a plan *must* classify all substantially similar claims together, regardless of the debtor's intent. *See Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir.1984).

The preeminent case on the question is *Greystone III*, a case whose facts are quite similar to those in the instant case before the court. In *Greystone III*, the Court of Appeals for the Fifth Circuit observed that although similar claims may be placed in different classes, a wholly permissive reading of the statute would render subsection (b) of § 1122, which specifically allows separate classification of small claims, superfluous. In widely quoted language, the Fifth Circuit concluded:

[There is] one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify

similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.

*Greystone III,* 995 F.2d at 1279.

Furthermore, contrary to Debtor's position, several courts have concluded that an analysis of legislative history in fact sheds little light onto the meaning of Section 1122. *See U.S. Truck,* 800 F.2d at 585–86 (concluding, after careful analysis of the classification sections of the former Bankruptcy Act and legislative history of Section 1122, that "Congress has sent mixed signals on the issue"); *In re Jersey City Medical Center,* 817 F.2d 1055, 1060 (3rd Cir.1987) (noting that "the legislative history behind § 1122 is inconclusive" regarding the significance of the wording of the section). Moreover, a reading of Section 1122 in the context of the rest of the Code suggests that discretionary separate classification of similar claims would undermine the Section 1111(b) election. As explained above, Section 1111(b) of the Bankruptcy Code permits an undersecured creditor to choose whether (i) its claim should be divided into a secured claim equal to the court-determined value of the collateral and an unsecured claim for the deficiency, or (ii) its entire claim should be considered secured. The purpose of the Section 1111(b) election is to allow the undersecured creditor to weigh in its vote with the votes of the other unsecured creditors. Allowing the unsecured trade creditors to constitute their own class would effectively nullify the option that Congress provided to undersecured creditors to vote their deficiency as unsecured debt.

Finally, approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code. A key premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization. Thus, although Debtor protests that prohibiting it from separating the unsecured claims of the FDIC from those of its trade creditors will effectively bar single asset debtors from utilizing the Code's cramdown provisions, Debtor fails to persuade that a single-asset debtor *should* be able to cramdown a plan that is designed to disadvantage its overwhelmingly largest creditor. Chapter 11 is far better served by allowing those creditors with the largest unsecured claims to have a significant degree of input and participation in the reorganization process, since they stand to gain or lose the most from the reorganization of the debtor. This Court thus holds that separate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims.

 In the instant case, Debtor was unable and failed to adduce credible proof of any legitimate reason for segregating the FDIC's unsecured claim from the unsecured claims of BPR's trade creditors. Debtor's reasons for why it should have been permitted to separately classify the FDIC's unsecured claim were: (1) the FDIC's and the trade creditors' unsecured claims were created from different circumstances and arise under different Bankruptcy Code sections; and (2) BPR's future viability as a business depends on treating its trade creditors more favorably than the FDIC. Neither is availing. The different origins of the FDIC's unsecured deficiency claim and general unsecured trade claims, claims which enjoy similar rights and privileges within the Bankruptcy Code, do not alone justify separate segregation. *See* Meltzer, *supra* at 299. More importantly, BPR has failed to present any evidence of a legitimate business reason for the separate classification of similarly situated unsecured creditor claimants. The trade creditors in Class 4 were few and consisted of a landscaper, property appraisers, rubbish removers, and accountants. None were essential to BPR's future. Both lower courts accordingly found an absence of a valid justification for the isolation of the FDIC deficiency claim. No evidence to the contrary was adduced.

**B. The residential security holders are not a class entitled to vote on the Plan**

·██ Debtor classified the residential tenants whose security deposits it was holding as a separate and "impaired" class for the purposes of a cramdown under § 1129(a). In

fact those interests were not harmed at all by the Plan, but are better off under the Plan. Under Connecticut law, residential security holders are entitled to interest on their security deposits at a rate of 5¼%. Conn.Gen. Stat. § 47a–21 (1993). Under the proposed Plan, the interest payable on security deposits held by the landlord was increased beyond the statutory rate to 8%.

Debtor urges that the word "impaired" in § 1124 be interpreted merely as "altered" or "changed" and contends that the Class 3 creditors' rights were certainly altered by the Plan. In support of its interpretation of § 1124, Debtor points first to the language of the statute, legislative history, and a recent Ninth Circuit opinion, *In re L & J Anaheim Assoc.*, 995 F.2d 940 (9th Cir.1993), which allegedly adopted Debtor's interpretation of Section 1124.

 This Court need not even reach the issue of whether an "altered" claim may qualify as "impaired." In this case, the Class 3 tenant security depositors could not constitute a voting class of creditors for purposes of effecting cramdown. Any claim for return of tenant security deposits would arise from the lease between the debtor and the tenant. Under the Bankruptcy Code, unexpired leases must be assumed or rejected by the Debtor. 11 U.S.C. § 365. When, as in the instant case, the Debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. *Greystone III*, 995 F.2d at 1281. The obligations assumed by the debtor under the continued leases constitute post-petition administrative claims. *See* 11 U.S.C. § 503(b)(1)(A). Such administrative claims are defined as priority claims under 11 U.S.C. § 507(a)(1), and must be paid in full in cash pursuant to 11 U.S.C. § 1129(a)(9)(A); their holders are not entitled to vote on a plan of reorganization. As the Fifth Circuit held in *Greystone III*:

> A debtor in Chapter 11 must either assume or reject its leases with third parties. 11 U.S.C. § 365. If the debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. *See Matter of Whitcomb & Keller Mortgage Co.*, 715 F.2d 375,

378–79 (7th Cir.1983); *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir.1983). Under the Code, only creditors are entitled to vote on a plan of reorganization. *See* 11 U.S.C. § 1126(c). A party to a lease is considered a "creditor" who is allowed to vote, 11 U.S.C. § 1126(c), only when the party has a claim against the estate that arises from rejection of a lease. *In re Perdido Motel Group, Inc.*, 101 B.R. 289, 293–94 (Bankr.N.D.Ala.1989). If, however, the debtor expressly assumes a lease, the lessee has no "claim" against the debtor under § 1126(a). *See* 11 U.S.C. §§ 365(g), 502(g). The rights created by assumption of the lease constitute a post-petition administrative claim under section 503(b)(1)(A) of the Code. *LJC Corp. v. Boyle*, 768 F.2d 1489, 1494 n. 6 (D.C.Cir. 1985). The holder of such a claim is not entitled to vote on a plan of reorganization. 11 U.S.C. § 1126(a); *In re Distrigas Corp.*, 66 B.R. 382, 385–86 (Bankr.D.Mass.1986).

*Greystone III*, 995 F.2d at 1281. *See also In re Cantonwood Assocs. Ltd. Partnership*, 138 B.R. 648, 656 (Bankr.D.Mass.1992) (where Debtor neither assumes nor rejects leases, tenants' claims are post-petition administrative claims). Thus the Class 3 creditors' approval of the Plan was of no effect because its members were not entitled to vote on the Plan.

## CONCLUSION

To summarize: Debtor's Plan of Reorganization was properly denied confirmation for lack of the assent of an impaired non-insider class of creditors. The unsecured trade creditors do not qualify as such a class; they were segregated without any demonstrated legitimate reason from like unsecured creditors, who rejected the Plan and whose claims predominated in amount over those of the trade creditors. Nor do residential security deposit holders qualify as such a class; as holders of administrative claims, they were not entitled to vote on the Plan of Reorganization.

Affirmed.